734 So.2d 693 (1999)
STATE of Louisiana
v.
Helen BURNS.
No. 98 KA 0602.
Court of Appeal of Louisiana, First Circuit.
February 19, 1999.
*694 Walter P. Reed, District Attorney, Covington, Dorothy Pendergrast, Metairie, Counsel for Plaintiff-Appellee State of Louisiana.
Gwendolyn Brown, Baton Rouge, Counsel for Defendant-Appellant Helen Burns.
Before: FOIL, KUHN, and WEIMER, JJ.
WEIMER, J.
The defendant, Helen Burns, and her brother, Michael Wright (hereinafter referred to as "Wright"), were charged by grand jury indictment # 255875 with one count of second degree murder, a violation of LSA-R.S. 14:30.1, for the shooting death of her husband, Conway Burns. Burns pled not guilty.[1]
Initially, Burns alone was indicted for the offense under grand jury indictment # 245264, but a nolle prosequi was entered as to that indictment. She was subsequently re-indicted with her brother as a co-defendant.
After a jury trial, Burns was found guilty as charged. She filed motions for post-verdict judgment of acquittal and for new trial, but the motions were denied. She was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. She now appeals, designating four assignments of error.

SUFFICIENCY OF THE EVIDENCE
In assignments of error numbered three and four, Burns contends the trial judge erred in denying her motion for *695 post-verdict judgment of acquittal because the evidence presented at trial was legally insufficient to support her conviction.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. State v. Huls, 95-0541, p. 25 (La.App. 1 Cir. 5/29/96), 676 So.2d 160, 176, writ denied, 96-1734 (La.1/6/97), 685 So.2d 126. Where the key issue is the defendant's identity as the perpetrator, rather than whether or not the crime was committed, the State is required to negate any reasonable probability of misidentification. Positive identification by only one witness may be sufficient to support the defendant's conviction. State v. Parfait, 96-1814, p. 17 (La.App. 1 Cir. 5/9/97), 693 So.2d 1232, 1242, writ denied, 97-1347 (10/31/97), 703 So.2d 20.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Huls, 95-0541 at 25, 676 So.2d at 176-177.
The applicable definition of second degree murder in the instant case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." LSA-R.S. 14:30.1(A)(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Intent is a question of fact. Nevertheless, the intent at issue in this case, specific criminal intent, may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Seals, 95-0305, p. 6 (La.11/25/96), 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Buchanon, 95-0625, p. 4 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. Seals, supra. All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principles. LSA-R.S. 14:24.
Burns and Wright were tried jointly. We discuss the evidence against Wright in detail in State v. Wright, 98 KA 0601, also rendered this date. Herein, we set forth the evidence concerning Burns' role in the commission of the offense.
In the instant case, St. Tammany Parish Sheriff's Office Detective David Hall testified that on June 23, 1995, Burns surrendered herself to him at the jail facility of the sheriff's complex and gave a recorded statement in which she admitted to killing her husband. It is well established that once the crime itself has been established, a confession alone may be used to identify the accused as the perpetrator. State v. Carter, 521 So.2d 553, 555 (La.App. 1 Cir.1988).
*696 When Burns surrendered herself to Detective Hall, she had redness around her right eye, a blood bruise within the eye itself, and injuries inside and outside of her lips. In response to questioning, Detective Hall indicated that Burns did not complain of any injuries to her arms or her fingers, and that he did not see any swelling or bruising to either her fingers, her legs, or her torso. Detective Hall identified State Exhibit 16 as the statement/waiver of Miranda rights form given to and signed by Burns after he met her. He read the form to Burns and she claimed to understand her rights. Burns made an initial statement which was not recorded. Thereafter, Detective Hall asked Burns whether she would give a recorded statement and she voiced no objection. Detective Hall then recorded Burns' statement, again advising her of her Miranda rights at the beginning of the recording.
Detective Hall identified State Exhibit 10[2] as the statement/waiver of Miranda rights form that Burns signed at the beginning of the recording. He identified State Exhibit 39 as a Panasonic tape containing Burns' taped statement. He identified State Exhibit 40 as an accurate transcript of the statement. Over the objection of counsel for Burns, the taped statement was played for the jury.[3]
Covington Police Department Detective Melvin Crockett also testified that he was present during Burns' interview. He identified State Exhibit 16 as the statement/waiver of Miranda rights form given to Burns by Detective Hall and signed by Burns at the beginning of the interview. He also identified State Exhibit 17 as the statement/waiver of Miranda rights form given to Burns by Detective Hall and signed by Burns at the beginning of her taped statement.
In the taped statement, Burns confessed to shooting her husband. Her version of the events surrounding the shooting was as follows. On the morning of the offense she woke up her child and began giving her a bath. The child cried because she did not want to be awakened so early. The victim began cursing Burns concerning the child being in the bathtub and crying. Burns told the victim that she was getting ready to get the child out of the bathtub after she finished the child's bath. The victim immediately reached over Burns and lifted the child out of the bathtub and told Burns to get the child a towel and dry her off. Burns told the victim that he had taken the child out of the bathtub, so he should get a towel and dry the child off. The victim struck Burns in the face. Burns told the child to go in the bedroom, put her panties on, and wait. The victim began to beat Burns. Burns escaped down the hall, but the victim pushed her against the wall and punched her in the face. Burns fought with the victim, stopped to pick up the child, and attempted to get her keys, but the victim grabbed her hand and tried to break her fingers by pulling them back. The victim took away Burns' keys, but Burns had a spare set of car keys in her shoe. The victim continued to beat Burns and she continued to fight to get away. As Burns was making her way through the front room, the victim struck her and she fell on the sofa. The victim punched her while she was on the floor, striking her in her face, her head, her stomach, and "everywhere his fist [could] go."
The victim struck her again as she grabbed for the door. The victim dragged Burns down the steps and into the grass, *697 constantly hitting, kicking, and punching her. Burns heard her neighbor's door across the street close and assumed that the victim also heard this because he stopped beating her after calling her some names and kicking her. Burns went to her vehicle. She did not feel dressed because she was only wearing shorts, a shirt, and tennis shoes. She did not go back for the child because she "couldn't go back in there." She warmed up her car, a white Chrysler Newport, drove down the dirt road, parked, and cried. She wanted to telephone her boss, but felt unable to do so because her face was "messed up." She drove around for a while and decided to change clothes because her clothes were hot, sweaty, and bloody. Due to the time, Burns suspected that the victim had probably gone to work and so she returned to the home.
When she did not see her van at her home, she felt that it was safe to enter the home. However, she did not have her keys, so she broke a window to gain entry into the home. She changed clothes. She tried to think of somewhere to go take a bath, before beginning to look for sunglasses to cover her face. She rode around, got a cup of ice for her lip, and then waited across the street from where the victim worked.
After she saw the victim pass on his way home for lunch, she began following him. He was driving a white 1993 Aerostar van. The victim noticed Burns and sped up. Eventually, the victim slammed on his brakes in the middle of the road and jumped out of the van. Burns tried to put her vehicle into park, roll up her window, and get out of her vehicle, but the victim approached and reached through her open window. Burns tried to get out of the vehicle, and managed to get a leg out, but the victim pushed the door towards her leg. Burns reached over to a seat and retrieved a gun. She held the gun so that it was visible to the victim, but he did not retreat. She then reached out the window and fired the gun, but the victim kept coming. She then shot the victim, but he still kept coming. She shot the victim again and he fell to the ground. She left in her vehicle, went to her mother's house, and told her mother what had happened. She showed her mother the gun and told her that she (Burns) was going to the police station. Her mother went with her to the police station.
In response to Detective Hall's questioning, Burns added the following to her account. She indicated that when she went back to her house, her child was not there. She retrieved the gun, which belonged to the victim, when she went back to the house. She then loaded the weapon. According to Burns, she fired the weapon "maybe two or three times," but did not know how many times she hit the victim. After the victim fell to the ground, he threatened to kill her. When asked about the clothes she was wearing when she was beaten, she indicated that she left a green shirt and a white towel, which she had used to wipe her mouth, in her vehicle.
Detective Hall asked Burns whether she had picked up the gun when she went back to the house because she intended to find her husband and shoot him, and she answered, "I intended on hurting him like he hurted [sic] me." When Detective Hall asked Burns whether she intended to hurt the victim when she parked across from where he worked, she answered, "I intended to hurt him like he hurt me."
Detective Hall testified that Burns' mother never produced the clothing that Burns had alleged was in her vehicle, claiming that she (Burns' mother) was unable to find the clothing. Additionally, he identified State Exhibits 12-15 and 35 and 36 as photographs accurately depicting Burns' condition when he encountered her. He also testified that he spoke to the owner and two employees of Cross Incorporated, the victim's place of employment, and verified that the victim had worked there and had been at work on the day of the offense. He also learned that some individuals from Burns' family had come to *698 talk to the victim at his place of employment prior to the shooting on the day of the offense.
Burns' confession was corroborated in part by testimony from her mother, Hattie Wright, and her brother, Eric Wright. Hattie Wright testified that on the morning of June 23, 1995, she was at home with her two sons, Michael and Eric. She expected to see her daughter, Helen Burns, later in the morning because she customarily brought her baby to Mrs. Wright so that Burns could work. When Burns did not arrive with the baby as expected, Mrs. Wright persuaded Michael to drive her to Burns' home. Mrs. Wright explained that she was diabetic and had been feeling weak that particular morning.
When Mrs. Wright and Michael arrived at Burns' home, she was not there, but her child was walking in the front room. The victim was in the bathroom. He appeared "mad" and did not want to come out of the bathroom. Mrs. Wright asked where Burns was, and the victim answered, "Oh, she's gone." Mrs. Wright told the victim that she was "going to take the baby," and he responded, "Okay."
After Mrs. Wright and Michael returned home, she received a telephone call from the victim's cousin, Cheryl McGee. Ms. McGee told Mrs. Wright, "Ms. Hattie, it's unusual for Helenwe can't find her. She usually come to work, you know, because today is payday. Ms. Hattie, if I was you, I would try to find Helen." Mrs. Wright decided to ask the victim "if [Burns] was throwed [sic] in a ditch or [if] he had her hid somewhere." Mrs. Wright, the child, and Michael then drove to the victim's place of employment to speak to him. When Mrs. Wright asked the victim where Burns was, he answered, "No, ma'am, I ain't throwed her in no ditch. I don't know where she at [sic]." After the victim played with the child and kissed her, Mrs. Wright, the child, and Michael returned home.
At approximately lunchtime, Burns appeared at her mother's home with a gun in her hand. Mrs. Wright asked Burns, "Girl, what's wrong with you?" Upon hearing this, Michael jumped up, and Eric came out of his room. Burns responded, "I just shot my husband, Conway." When Burns was asked where she had shot the victim, she answered, "in Abita." According to Mrs. Wright, her daughter was "beaten up in the face and everything." Mrs. Wright drove her daughter to the Covington Police Department. Michael and Eric left with the baby to check on the victim. Mrs. Wright told Eric to take the baby to someone "to keep for [her]." Mrs. Wright indicated that she did not take the weapon with her when she went to the police department, but told the police of its presence at her home. Subsequently, upon request of the police, she retrieved the weapon and brought it to the police department.
Mrs. Wright testified that she knew of no animosity, bad feeling, or bad blood existing between the victim and Michael; that Michael never said that he was going to get the victim for doing "this" to his sister; and that Michael "didn't really know nothing about Helen and Conway having fights and stuff." When asked what kind of car her daughter had, Mrs. Wright answered, "She had a brown Dodge I think it was. A light car. The kind she have now." Subsequently, Mrs. Wright conceded that her daughter's car was at Enterprise Leasing at the time in question, and that she (Burns) had been driving a red rental car at that time. Mrs. Wright claimed that her daughter had told her that she (Burns) had the car because "[t]hey was going to go on vacation."
On cross-examination, the State accused Mrs. Wright of "concocting" the story about going to her daughter's home to explain away the fact that her daughter came by her home and conspired with Michael to kill the victim. Mrs. Wright denied the State's accusations. She conceded however, that she had not mentioned the telephone call from Cheryl *699 McGee when she testified before the grand jury, but explained that she had informed counsel for the State of the call at his office. She also conceded that she testified before the grand jury that when she initially questioned the victim concerning her daughter's whereabouts, he stated that he had just beaten her.
Eric Wright also testified. On the morning of June 23, 1995, he was at his mother's house where he lived. His brother Michael also lived in the home. Eric awoke between 6:00 a.m. and 7:00 a.m. after hearing his brother loudly protesting having to wake up and drive his mother to Abita "to see about Helen." His mother and brother returned with his sister's child.
Later that morning, Eric was told that his mother and brother were going to the victim's place of employment. According to Eric, his brother came back from the victim's place of employment upset. When asked what his brother was upset about, Eric answered, "He had heard that Helen had got beaten up and then he didn't want to get up that morning, my mom wanted him to get up and go with her and he just didn't want to get up. So he was just upset."
Eric saw his sister at approximately noon when she came to the house "with a hat on and some shades and a gun in her hand." Mrs. Wright calmed Burns down and took her to the police. Eric and Michael took the baby to their cousin's home. After dropping the child off, Eric and Michael went to Abita to see what had occurred. They traveled in Eric's gold colored Acura Legend automobile. They knew where to go because they had overheard their sister's conversation with their mother. Eric acknowledged that Michael was outraged and yelling when they got to the scene, but explained that this was because of their sister getting beaten up. When asked whether his brother could have been gone from the house for an extended period without his (Eric's) knowledge, he answered, "No." However, he did concede that he was in his room asleep when his mother and Michael brought the child home, and thus, he did not know whether Michael drove off again.
On cross-examination, Eric guessed that his mother and Michael were gone for about half-an-hour. He conceded that he had seen his sister's red rental car on the day of the offense, but denied taking it to Enterprise with Michael. In response to questioning on re-direct examination, Eric stated that although Michael was upset at the scene, he was not "in a fighting rage."
Burns' confession was shown to have been materially incomplete based on testimony from Lisa Armstrong Holmes. Ms. Holmes testified that on the day in question, she was working at the Covington branch of Enterprise Car Rental. She identified State Exhibit 37 as a rental agreement between Enterprise Car Rental and Burns renting a red Metro on June 23 at 10:05 a.m. for one day to be driven instate. She described the person who rented the vehicle as a black lady with short hair. She noticed nothing unusual about her and noticed no unusual markings on her. She testified that a driver's license was required of anyone wishing to rent a vehicle, and that the person identified as Helen Burns had presented her with a driver's license on this occasion. The vehicle was returned on June 24 at 11:50 a.m. by two men. Ms. Holmes thought this strange because the men were not authorized to drive the vehicle.
A possible motive for Burns' crime, other than revenge for abuse, was presented based on testimony from Robert L. Bailey, III, the victim's attorney. On May 12, 1995, Mr. Bailey finalized drafting the victim's will. He testified that the victim did not approve the initial draft of his will, explaining that it had not been acceptable to his wife, and made changes to leave his wife more under the will. Mr. Bailey found it unusual that the victim's wife never appeared to have her will drafted because in his experience young married *700 couples usually appeared and made wills together, Mr. Bailey identified State Exhibit 38 as the final will of the victim.
Certain other testimony concerning the offense was also presented. Martha Burghardt testified that on June 23, 1995, at approximately noon, she was at her home on Highway 36 cleaning dishes at the kitchen sink. She looked up after hearing a noise, which at first she thought was a car accident. She saw two people fighting near a white van and a "little red car." She then saw one of the individuals go to the red car and retrieve a gun. The person held the gun "like halfway out the car door" and fired. She commented, "Boy, he really wants that person dead." She had no telephone, so after waiting for the shooter to leave, she flagged-down a pickup truck and asked the driver to alert an ambulance and the police. She did not see the faces of the two people and could not determine their skin color. When asked if she had seen Wright at the crime scene, she answered "No." She testified before the grand jury that she thought the two persons were male because they were dressed in jeans, but conceded that it could have been a man and a woman in jeans or two women in jeans. The only times that she had seen Burns was before the grand jury and in the courtroom during trial.
Robbie Anthony testified that on the date in question, he was at his desk in his business located on Highway 59, at the red light in Abita Springs. He looked out of the window after hearing a gunshot. He saw a white van with a "little red car" behind it "with a person out the window." He saw an anxious and nervous African-American male driving the van and an African-American male in the red car pointing a gun towards the van. The driver of the van turned left and stopped near an Abita police officer, but then drove off. Mr. Anthony did see the faces of both drivers. However, he could not identify Wright as being the person in the red vehicle.
On redirect examination, the State asked Mr. Anthony whether he was saying that Wright was not the man in the red vehicle or whether he was saying that he could not say whether Wright was or was not the man. Mr. Anthony answered that he could not say whether Wright was or was not the man.
Zachary Sloan testified that on June 23, 1995, at approximately noon, he was driving home on Highway 36 to have lunch. As he parked in his driveway, he noticed a white van parked sideways in the middle of the road. Two men were struggling on the other side of the van. One of the men got up. He was a black man, 5'11"-6' tall, wearing a white sleeveless T-shirt and blue sweat pants. As Mr. Sloan was closing his gate, he looked over at the man and saw his arms go out, saw the man hunch over, and heard five gunshots. Mr. Sloan turned to run into his house to call police. As he turned, he saw two people come around the back of the van and get into "a little red foreign car." Mr. Sloan did not see anyone's face, did not see the weapon, and his entire view of the incident lasted approximately fifteen seconds.
Approximately fifteen minutes after the police arrived and approximately thirty minutes after the shooting, Mr. Sloan saw someone matching the description of the shooter "coming down the street" from about two blocks away. The person was coming from the same neighborhood that Mr. Sloan "believed" the red car had turned into. He identified Wright as the person matching the description, commenting that he had gone to school with Wright and had played football with him in the eighth grade.
Mr. Sloan testified that Wright looked like the shooter to him because of physical appearance, but he could not say for sure because he never saw the shooter's face. He also testified that he could not be certain of the shooter's gender because he never saw that person from the front.
Abita Springs Police Department Sergeant Scott Meyer also testified. On June *701 23, 1995, at approximately noon, he was working an accident on Highway 36 near the red light in Abita when he heard a gunshot. He "ducked," but then continued to write-up the accident. Approximately forty-five seconds later, one of the persons involved in the accident advised Sergeant Meyer that a vehicle had stopped behind him and that its driver was trying to attract his attention. Sergeant Meyer turned and saw that the vehicle was a white van. The white van drove off followed by a small red car. Sergeant Meyer did not see the occupants of either vehicle. Approximately thirty seconds to a minute later, Sergeant Meyer was advised by radio of a shooting on Highway 36. Sergeant Meyer went to the scene of the shooting, which was approximately half-a-mile from his then location. He spoke to Robbie Anthony, a witness to the incident, and transported him to the sheriff's office upon learning that he had information concerning the shooting.
Reverend L. Stephen Holzhalb testified on June 23, 1995, he and his wife were driving from Covington to Abita when a white van pulled in front of them as if to make a left turn. A person, which to the best of Reverend Holzhalb's recollection was an African-American man, exited the van and moved towards a small red car behind the van. The Reverend did not see any of the occupants of the car. He then heard three or four gunshots, and while his wife telephoned police, he put his vehicle in reverse, backed into a driveway, and left the scene.
St. Tammany Parish Sheriff's Office Deputy Barney Tyrney testified that he responded to the shooting on Highway 36 on June 23, 1995, at approximately noon. He found a white Ford van blocking both lanes of travel on Highway 36 and a black male lying shot approximately 20 or thirty feet from the van. He secured the scene and spoke to Martha Burghardt, who reported that the perpetrator had been a black male. He was also notified of another witness, Robbie Anthony, who had reported that someone in a red car had shot at the white van.
Deputy Tyrney saw Wright at the scene approximately eight to ten minutes after he arrived and approximately ten to twelve minutes after the shooting. According to Deputy Tyrney, Wright was accompanied by his brother, Eric, and he (Wright) was "extremely upset and irate." Wright kept yelling, "You don't understand. He whipped my sister's ass this morning. You don't understand." Deputy Tyrney indicated that Wright calmed down after being threatened with arrest.
Deputy Tyrney saw Burns when he went back to the police station. She had minor swelling to one of her eyes and minor irritation to her lip. Deputy Tyrney identified State Exhibits 12-15 as photographs fairly and accurately depicting Burns' face as it appeared when he observed her. Those photographs corroborate Deputy Tyrney's observations.
Covington Police Department Detective Melvin Crockett testified that on June 23, 1995, at approximately noon, he was dispatched to the hospital to discover the identity of the victim of the offense. Subsequently, he went to the St. Tammany Parish Sheriff's Office after receiving a radio message that the person involved in the shooting was at that location. When he exited his vehicle at the Sheriff's office, he saw Michael Wright and his brother, Eric, sitting in a vehicle. Detective Crockett had known Wright since childhood. Wright got out of the vehicle and stated, "Magic, tell my sister, Helen, to come on out of there."[4] When asked about Wright's demeanor as he made the statement, Detective Crockett answered, "He was pissed off for some unknown reason." Detective Crockett went into the detective *702 division, found Burns and her mother, and told them that Wright "wanted them outside." Detective Crockett identified State Exhibits 12-15 as photographs accurately depicting Burns' appearance on June 23, 1995.
Jefferson Parish Coroner's Office Forensic Pathologist Fraser Mackenzie testified regarding the autopsy he had performed on the victim. He indicated the cause of death was two gunshot wounds which perforated the victim's heart, liver and kidney.
St. Tammany Parish Sheriff's Office Sergeant Otto Stubbs testified about his role in the investigation. He indicated he had ten years experience in "firearms identification," which he defined as determining whether a certain bullet was fired from, or whether a certain cartridge case was fired by, a particular weapon. He identified State Exhibit 32 as the model 15 Smith and Wesson .38 caliber revolver which Detective Blackwell submitted to him with five fired cartridge cases. He also identified State Exhibit 34 as the two fired .38 caliber bullets Dr. Mackenzie removed from the victim's body in his presence. Sergeant Stubbs' tests revealed that the two bullets were fired by the .38 caliber revolver. Sergeant Stubbs also identified State Exhibits 35 and 36 as photographs of Burns that he had taken on the day of the offense. He testified that the photographs showed cuts to Burns' upper and lower lips. Those photographs corroborate Sergeant Stubbs' observations.
St. Tammany Parish Sheriff's Office Detective James Blackwell testified that on June 23, 1995, he was a member of the criminal patrol division. On that date, he went to the Covington Police Department and recovered a weapon from Hattie Wright. He immediately placed the weapon into an evidence bag, and eventually turned the weapon over to Sergeant Stubbs. Detective Blackwell identified State Exhibit 32 as the weapon that Mrs. Wright surrendered to him and that he immediately placed into an evidence bag on June 23.
Beverly Sylve, the victim's mother, testified that she last saw the victim alive on the Sunday before his death, which was Father's Day. The victim did not mention anything about planning to go to Florida with Burns. Ms. Sylve testified that if the victim would have had such plans, he would have mentioned them to her. This testimony, coupled with testimony that Burns and the victim owned a van, casts dispersions on testimony that the small red rental car was leased for a vacation trip to Florida.
Defense witness Joseph Nathaniel Davidson testified that on the date in question, the victim passed by him driving a white van. After Mr. Davidson made a turn and traveled approximately a half block, he heard gunshots and ran to the corner. He saw a man getting into a red car and "taking off." He could not determine the race of the man. He did not know whether or not the man who jumped into the red car was Wright. He also did not know whether or not anyone else was in the vehicle. When asked if the "man" could have been a female in male clothing, Mr. Davidson responded, "If it was a female in man [sic] clothing, she had no humps or bumps nowhere on, you know what I am saying."
Defense witness Gary Andrews also testified. On June 23, 1995, he was working nights and would have arrived home from work between 6:30 a.m. and 7:00 a.m. He lived across the street from Burns and the victim. When he was getting out of his vehicle in his yard after coming back from work on June 23, 1995, he heard a noise across the street. He described the noise as sounding like something being hit or dropped. He looked, but saw nothing. He went into his home and closed the door. However, he then heard another noise, looked out, and this time saw the victim's trailer door open. He walked to the back of his vehicle and saw the victim *703 standing over Burns, telling her something. Burns got up and walked to her "big white car" with her head down. Her face appeared swollen. The victim went back into his home and Mr. Andrews went back into his home. When Mr. Andrews next looked out, Burns' vehicle had gone. Mr. Andrews did not see a red Geo Metro vehicle at Burns' home. He conceded that he was a distant cousin of the Wright family.
After a thorough review of the record, we are convinced the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of the offense of second degree murder and the defendant's identity as a principal to the offense. The defendant's confession was compelling evidence of her guilt. Additionally, the defendant's mother, Hattie Wright, and her brother, Eric Wright, both testified concerning the defendant appearing at their door with a gun in her hand on the day of the offense. Mrs. Wright further testified that the defendant confessed to her that she had shot the victim. We are aware that in her confession to Detective Hall, and apparently in her confession to her mother, the defendant confessed to being the one who actually shot the victim, as opposed to her brother being the shooter. However, any inconsistencies between the details of the confession and the evidence at trial were a matter for the jury to resolve. The unanimous guilty verdict rendered against the defendant reflects that the jury obviously resolved those inconsistencies against the defendant and in favor of the State's theory. The State's theory was that the defendant confessed to shooting the victim, when in fact Wright actually shot the victim, albeit with her assistance, as part of a strategy designed to prey on the sympathies of the jury for a battered wife who killed her abusive husband. Testimony at trial from Ms. Holmes showed that the defendant omitted from her confession the fact that she personally rented the vehicle apparently used in the commission of the offense shortly before the offense. Testimony from Mr. Anthony, Mr. Sloan, Reverand Holzhalb, and Mr. Davidson was to the effect that a male shot the victim. Additionally, while Mr. Davidson did not know whether anyone else was in the getaway car that the shooter jumped into after the offense, Mr. Sloan specifically testified that two persons got into the getaway car after the offense. Accordingly, this assignment of error is without merit.

JURY VENIRE
In assignment of error number one, Burns contends the trial court erred in denying her motion to have a panel of jurors excused after the State tainted the panel by asking its members questions designed to elicit responses which would commit them to a particular verdict based upon a "hypothetical" factual situation virtually identical to the factual circumstances of the case before it.
During its questioning of the first panel of prospective jurors, the State discussed the law of self-defense and questioned the panel concerning a hypothetical situation wherein female State counsel approached male State counsel with open hands and threatened to kill him, and a hypothetical situation wherein a 6' 4," 250 pound husband beat his wife. After the hypotheses were discussed, counsel for the defendant objected, arguing that the hypotheses were close enough to real issues in the case that the jury panel could not be fair. The State pointed out that no objection had been voiced during the hypotheses. Additionally, the State added that it was merely trying to explore the panel's views relative to husbands and wives and abuse and prior abuse, "critical issues in the case which [could not] be avoided." The trial court instructed the State to limit its inquiry to the law and denied the motion to release the panel. The court then admonished the panel that, pursuant to their oaths as jurors, they were the judges of *704 the facts; that the court would instruct them on the law, including the law of self-defense; that the factual determinations were to be made after instruction by the court on the law; that they were not now in a position to obligate themselves, and had not obligated themselves in any way concerning their determinations as triers of fact or their verdict. After concluding its admonition, the court asked counsel for the defendant if he had any further objection or requested any further admonition, and counsel answered, "No, Your Honor."
Louisiana Code of Criminal Procedure article 419 provides:
A. A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
B. This Article does not affect the right to challenge for cause, a juror who is not qualified to serve.
Initially, as pointed out by the State, objection to the hypotheses after the State had already used them was untimely. See LSA-C.Cr.P. art. 841(A). Moreover, the State's use of the hypotheses was not a "great wrong committed that would work irreparable injury to the defendant." See LSA-C.Cr.P. art. 419(A). The trial court quickly and easily cured any prejudice to the defendant with its admonition to the panel. Accordingly, there was no abuse of discretion by the trial court in refusing to dismiss the first panel of prospective jurors. This assignment of error is without merit.

BATSON
In assignment of error number two, Burns contends the trial court erred in accepting as racially neutral, the prosecutor's explanation of his peremptory challenge to exclude prospective juror Calvin Burris.
In Batson v. Kentucky, 476 U.S. 79, 96-97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986), the Supreme Court adopted the following three-step analysis to determine whether or not the constitutional rights of a defendant or prospective jurors had been infringed by impermissible discriminatory practices. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. See State v. Galliano, 96-1736, p. 4 (La.App. 1 Cir. 6/20/97), 696 So.2d 1043, 1047, writ denied, 97-1963 (La.1/9/98), 705 So.2d 1098, citing, Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
Further, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." Galliano, 96-1736 at 5, 696 So.2d at 1047, citing, Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Galliano, 96-1736 at 5, 696 So.2d at 1047, citing, Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21. Reasons offered to explain the exercise of peremptory challenges should be deemed race-neutral unless a discriminatory intent was inherent in those reasons. Galliano, 96-1736 at 5, 696 So.2d at 1047.
In the instant case, the voir dire transcript reflects that when the court questioned the members of the second panel of prospective jurors concerning whether they knew any of the parties involved, prospective juror Calvin E. Burris revealed that he knew counsel for the defendant. Mr. Burris stated that he knew *705 counsel, "Just by being a resident of Folsom." The court questioned Mr. Burris further, inquiring whether or not he was close friends with counsel. Mr. Burris responded that he had worked at the local supermarket where counsel had been a customer. The court further inquired if Mr. Burris was saying that counsel was his acquaintance, and Mr. Burris answered, "Right." When the court asked whether or not his relationship with counsel for the defendant would affect his ability to be fair, Mr. Burris answered, "No, sir."
Subsequently, the State exercised a peremptory challenge against Mr. Burris. Counsel for the defendant raised a Batson objection to the challenge. The State explained that although Mr. Burris had stated that he could be fair and impartial, he had also admitted to knowing or being an acquaintance of counsel for the defendant. The State also noted that Folsom is a "very small town." The court accepted the State's reason for its challenge as racially neutral and permitted the State to exercise a peremptory challenge against Mr. Burris, noting an objection by the defense.
Applying the Batson analysis, we conclude that the defendant failed to meet his burden under step one. However, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Galliano, 96-1736 at 6, 696 So.2d at 1048, citing, Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866.
In regard to step two of the Batson analysis, we note that the State's reasons for exercising a peremptory challenge against Mr. Burris were facially "race-neutral." They contained none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. See Galliano, 96-1736 at 6, 696 So.2d at 1048. Accordingly, the State sustained its burden of articulating "race-neutral" reasons for the exercise of the peremptory challenge at issue.
Whether these reasons were substantial and, more importantly, whether they are substantiated by the record, is determined in step three of the Batson analysis. Reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony. Thus, the proper inquiry in this final stage of the Batson analysis is not whether the State has disproved the existence of purposeful discrimination suggested by a defendant's prima facie case; rather, the question is whether a defendant's proof, when weighed against the prosecutor's "race-neutral" reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present. Any other approach would violate the principle that the ultimate burden of proving racially motivated strikes in violation of Batson rests with the opponent of the strike. See Galliano, 96-1736 at 6-7, 696 So.2d at 1048.
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in accepting the State's reasons for exercising a peremptory challenge against prospective juror Mr. Burris as race-neutral. Accordingly, this assignment of error is without merit.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Michael Wright has a separate appeal pending before this Court arising from his conviction for this offense. See State v. Wright, 98 KA 0601, also rendered this date.
[2] The State apparently misspoke in identifying this exhibit as State Exhibit 10, rather than State Exhibit 17. Detective Hall's testimony makes clear that State Exhibit 17, rather than State Exhibit 10, was actually presented to him for identification.
[3] The defendant's challenge to the admissibility of her confession was apparently abandoned. The instant appeal does not contain any assignments of error concerning the confession.
[4] Although not specifically indicated in the record, it is apparent that Wright directed this comment to Detective Crockett.