822 So.2d 121 (2002)
STATE of Louisiana
v.
Charles RODRIGUEZ, Jr.
No. 2001 KA 2182.
Court of Appeal of Louisiana, First Circuit.
June 21, 2002.
*125 Scott M. Perrilloux, District Attorney, By Donald Wall, Richard Schwartz, Assistant District Attorney, Amite, for State of Louisiana.
Clive Stafford Smith, Matthew Rubinstein, New Orleans, for Defendant/Appellant Charles Rodriguez, Jr.
Before: GUIDRY, DOWNING and CLAIBORNE,[1] JJ.
DOWNING, J.
The defendant, Charles Rodriguez, Jr., was charged by grand jury indictment with two counts of first degree murder, violations of LSA-R.S. 14:30. He pled not guilty. Following the guilt phase of a jury trial, he was found guilty as charged by unanimous verdict. Following a penalty phase, on each count, the jury unanimously determined the defendant should be sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. He moved for new trial, but the motion was denied. He was sentenced, on each count, to life imprisonment without benefit of probation, parole, or suspension of sentence.[2] He now appeals, designating five assignments of error. We affirm the convictions and sentences.

FACTS
On October 24, 1997, the defendant shot his ex-wife, Mary Easley Rodriguez (Mary), and her friend, Brent Louque, to death in the home the defendant and Mary had shared. The defendant and Mary had been separated since April 4, 1996. The defendant shot Mary once in the chest and twice in the back of the head.[3] Forensic pathologist Dr. Susan M. Garcia testified that it was more likely than not Mary was shot in the chest before she was shot in the back of the head. The defendant shot *126 Louque once in the face, twice in the side, and five times in the back of the head. Dr. Garcia testified it was more likely than not Louque was shot in the back of the head after receiving his other wounds. The defendant's and Mary's child (under two years of age) was present during the shootings. The defendant's five shot revolver and thirteen empty shell casings were recovered from the crime scene. No other weapons were recovered from the crime scene.
John Easley, Mary's father, went to the crime scene. In response to Easley's questioning on why the defendant had "done it," the defendant answered he shot Louque first and then Mary "when she jumped up." The defendant did not indicate to Easley that either Louque or Mary had attacked him. When Ponchatoula Police Chief Tim Gideon responded to the crime scene, the defendant told him, "I just killed my wife and her boyfriend and I am going to kill myself." The defendant did not indicate to Chief Gideon that either Louque or Mary had attacked him. The defendant's uncle, Louie Badon, also arrived at the crime scene. The defendant told Badon, "[the defendant] had taken Mary and Brent's life and he wasn't going to live through the rest of the day." The defendant did not indicate to Badon that either Louque or Mary had attacked him.
The defendant did not testify at trial, but his account of the shootings, recorded on an audiotape on the day of the shootings, was played for the jury. At 7:00 a.m., after the defendant finished the night shift at Elmer's, his place of employment, he went to his parents' home. At 10:00 a.m., he telephoned Mary "so [the defendant] knew she was home." And when Mary answered the phone, "[the defendant] didn't bother to talk." The defendant drove to Mary's home. When he arrived, he noticed a truck parked next to Mary's vehicle. The defendant did not know whom the truck belonged to the first time he saw the truck. The defendant became "agitated," removed his gun from his truck and placed the weapon in his belt behind his back. He placed extra bullets in his pocket. When asked why he got his gun and extra bullets, the defendant stated, "I had heard rumors about him about starting stuff and different things, that's the first time I ever seen him. That's the first time I ever knew it was him, til she introduced us."
The defendant went to one of Mary's neighbor's homes, telephoned Mary's parents, and asked them to come over because "[the defendant] and Mary had a lot of things to discuss." Mary's father told the defendant he did not want to talk to the defendant, did not care, and did not want to get involved in what was going on at the house.
The defendant went back to Mary's house and knocked on the door. No one answered, and the defendant knocked again. Again, no one answered. After the defendant had knocked and waited approximately seven or eight times, Mary asked, "Who is it?" The defendant identified himself, and Mary invited him into the house. Mary sat in a chair to the defendant's right, and "the guy" sat in a chair to the defendant's left. The defendant talked to Mary about quitting his job at Elmer's and going back to Modern Maid and how he and she were going to survive on the money he made. Mary's parents separately telephoned her, and Mary told them everything was all right and she and the defendant "were talking." Mary told the defendant she wanted the house in her name, and an argument ensued between Mary and the defendant. Louque "jumped up out the chair," and the defendant shot him three times. Mary "jumped up at [the defendant,]" and the defendant *127 shot her twice. Mary grabbed the telephone, but the defendant took the telephone away from her. Mary ran back to the living room and "passed out." The defendant "reloaded and shot [Mary and Louque] again." Mary's and the defendant's one-year old child was in the defendant's arms during the shootings. The defendant did not know how many shots he fired or how many times he reloaded, but conceded he had a five shot revolver.
After the shootings, the defendant telephoned each of his parents separately. Mary's father called and asked to speak to Mary, and the defendant told him he could not and hung up the telephone. Mary's father them came over to the house. The defendant indicated he let Mary's father leave with the baby after the police arrived and "was still holding the gun in [the defendant's] hand, threatening to kill my ownself. That's why, that's how I feel, that's how I still feel. I, I don't, I can't live with what I done, and that, that, that's just how it is, I, I, I just don't know how else to say it. What I done was done whenever he jumped up in my own house, in, in, in mine and Mary's house, and gonna attack me. That's when for us, it all went downhill from there."

BATSON-J.E.B.
In assignment of error number 1, the defendant contends he was deprived of his right to a fair trial when the State impermissibly struck potential jurors based upon their gender. He argues the issue is controlled by State v. Givens, 99-3518 (La.1/18/01), 776 So.2d 443. In assignment of error number 2, the defendant contends he was deprived of his right to a fair trial when the State impermissibly struck potential jurors based upon their race. He argues the State's reasons for striking potential juror Alvin Francois were pre-textual because jurors who sat on the jury made statements more favorable to the defense than Francois's statements.[4] In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court adopted the following three-step analysis to determine whether or not the constitutional rights of a defendant or prospective jurors had been infringed by impermissible discriminatory practices. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. State v. Burns, 98-0602, p. 19 (La.App. 1 Cir. 2/19/99), 734 So.2d 693, 704, writ denied, 99-0829 (La.9/24/99), 747 So.2d 1114.
Further, the second step of this process does not demand an explanation that is persuasive, or even plausible. Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Reasons offered to explain the exercise of peremptory challenges should be deemed race-neutral unless a discriminatory intent was inherent in those reasons. *128 Burns, 98-0602 at pp. 19-20, 734 So.2d at 704.
In order to make a prima facie showing that the prosecutor has exercised peremptory challenges on an impermissible basis, the defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor during voir dire that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination. See State v. Duncan, 99-2615, p. 14 (La.10/16/01), 802 So.2d 533, 545.
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venire-persons has emerged during voir dire but also whether the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. See Duncan, 99-2615 at p. 14, 802 So.2d at 545.
For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result must ultimately be traced to a racially discriminatory purpose. Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. State v. Green, 94-0887, pp. 23-24 (La.5/22/95), 655 So.2d 272, 287.
The same three-step burden-shifting framework outlined in Batson is utilized regardless of whether the challenge is based on race or gender.[5]Duncan, 99-2615 at p. 11, 802 So.2d at 543.
In the instant case, the voir dire transcript reflects the defense objected under Batson when the State used a peremptory challenge against Alvin Francois.[6] The defense argued the State had used their challenges to eliminate one hundred per cent of the African-American population of the jury. The State responded Francois was not the only African-American on the jury panel and that the State might very well accept other African-Americans.[7] The court then asked the State for a racially neutral reason for its use of a peremptory challenge against Francois.
The State responded:
Mr. Francois, his answer to voir dire questions posed on the death penalty issue, in they should be put away and taken care of. He also used the word "help" when he said that he was in the past numerous times tried to help people with a myriad of problems.
He also indicated indicate (sic) he can get to the point where he knew he could lose it in response to Mr. Stafford-Smith's questions. He also indicated thatnot with respectwell, respect to someone threatening his kid, he could lose it easily.

*129 He also said mercy makes him feel very comfortable and I am not looking for merciful people on this jury.
The court found the State articulated a racially neutral reason for exercising a peremptory challenge against Francois.
The voir dire transcript indicates when Francois was asked how he felt about people who suffered from serious mental illnesses such as schizophrenia, he answered, "I think they should to be (sic) put away and taken care of, because they are sick people and they need to be helped." In response to questioning concerning people who had difficult marital relationships and break-ups who had come to him, Francois indicated the only thing he could do was try and help those people the best way he could. When asked how he would react if one of his children was threatened in his presence, Francois indicated, "I get to the point sometime to where I know I can lose it. And I try not to go that far." Francois also indicated the "notion" he could always exercise mercy made him more comfortable.
Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. Burns, 98-0602 at pp. 20-21, 734 So.2d at 705.
In regard to step two of the Batson analysis, we note that the State's reasons for exercising a peremptory challenge against Francois were facially "race-neutral." They contained none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. See Burns, 98-0602 at p. 21, 734 So.2d at 705. Accordingly, the state sustained its burden of articulating "race-neutral" reasons for the exercise of the peremptory challenge at issue.
Whether these reasons were substantial and, more importantly, whether they are substantiated by the record, is determined in step three of the Batson analysis. Reviewing courts owe the trial judge proper deference in assessing the credibility of in court testimony. Thus, the proper inquiry in this final stage of the Batson analysis is not whether the state has disproved the existence of purposeful discrimination suggested by a defendant's prima facie case; rather, the question is whether a defendant's proof, when weighed against the prosecutor's offered "race-neutral" reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present. Any other approach would violate the principle that the ultimate burden of proving racially motivated strikes in violation of Batson rests with the opponent of the strike. See Burns, 98-0602 at p. 21, 734 So.2d at 705.
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in accepting the State's reasons for exercising a peremptory challenge against prospective juror Francois as race-neutral. The defendant does not cite, nor do we discern, from the prosecutor's statements, questions or comments during the lengthy voir dire in this case any inference of race-based exercise of peremptory challenges. Further, the State's peremptory challenge against Francois was not part of a pattern of racial strikes. Francois was the first African-American prospective juror peremptorily challenged by the State. Additionally, the reasons offered in support of the State's challenge against Francois were non-race related and supported by the record. It is also noteworthy that the defendant and the victims herein were all *130 Caucasian-Americans and that the actual jury that tried this capital case requiring a unanimous verdict had one African-American juror even though the State had unused peremptory challenges. See Duncan, 99-2615 at pp. 24-28, 802 So.2d at 551-53.
We reject the defendant's claim the State's reasons for striking Francois were pretextual because jurors who sat on the jury made statements more favorable to the defense than his statements. Even assuming arguendo, that similar responses were given by other prospective jurors, the fact that some were accepted by the State and Francois was excused by the State does not in itself show that the explanation for excusing Francois was a mere pretext for discrimination. The accepted jurors may have exhibited traits which the prosecutor reasonably could have believed would make these individuals desirable as jurors. See State v. Leagea, 95-1210, pp. 4-5 (La.App. 1 Cir. 5/10/96), 673 So.2d 646, 650, writ denied, 96-1507 (La.11/22/96), 683 So.2d 287.
We also find no abuse of discretion in the trial court's finding the defendant failed to establish a prima facie case of gender discrimination in the State's exercise of peremptory challenges.
The voir dire transcript indicates the defense raised a gender Batson challenge on the basis that six of the nine peremptory challenges exercised by the State were exercised against female prospective jurors. The trial court asked the defense if it wished to offer anything "other than just the numbers" in support of a prima facie case, and the defense responded, "Your Honor, I think that is a prima facie case and we will rest on that." The court held:
All right. The court is not satisfied that the mere numerical showing from the statistics is sufficient in this case to establish a prima facie claim under a gender discrimination as to a Batson challenge. The court takes notice that the challenges, while the numbers are correct, did not occur in a fashion due to the backstrikes that would create any system, deliberate system that the court observes in this case. Denied.
The Louisiana Supreme Court recently rejected a defendant's reliance on bare statistics to support a prima facie case of both gender and race discrimination, noting:
Neither the total exclusion of a cognizable group from the jury nor the mere presence of one or two perhaps token members of the group on the jury is dispositive of whether the prima facie requirement is satisfied. "The mere inclusion of some blacks on the jury is no bar to a finding of a prima facie case, and there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out." [5 Wayne R. LaFave, et al, Criminal Procedure § 22.3(d)(2nd ed.1999)] (collecting cases). Such number games, stemming from the reference in Batson to a "pattern" of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied. Indeed, such attempts to fashion absolute, per se rules are inconsistent with Batson in which the court instructed trial courts to consider "all relevant circumstances." 476 U.S. at 96-97, 106 S.Ct. 1712. Consequently, "it is important that the defendant come forward with facts, not just numbers alone, when asking the district court to find a prima facie case." United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990).
Duncan, 99-2615 at pp. 21-22, 802 So.2d at 549-50.
*131 Additionally, the Louisiana Supreme Court has held that cases where the trial judge makes an express factual finding in rejecting the defendant's claims of a prima facie case are distinguishable from and "in an entirely different posture" than cases such as Givens. See Duncan, 99-2615 at pp. 17-18, 802 So.2d at 547-48.
These assignments of error are without merit.

IMPROPER PROSECUTORIAL COMMENT
In assignment of error number 3, the defendant contends improper statements by the prosecution in closing argument mandate a new trial be granted in this matter.
Louisiana Code of Criminal Procedure article 770, in pertinent part, provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the ... district attorney, ... during the trial or in argument, refers directly or indirectly to:
. . . .
(3) The failure of the defendant to testify in his own defense.
. . . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
Louisiana Code of Criminal Procedure 770(3) prohibits both direct and indirect references to the defendant's failure to testify. Even without these statutory prohibitions, the United States Supreme Court has held that a prosecutor is not free to comment upon a defendant's failure to take the stand since such a comment violates the self-incrimination clause of the Fifth Amendment made applicable to the states through the Fourteenth Amendment. State v. Moser, 588 So.2d 1243, 1247 (La.App. 1 Cir.1991), writ denied, 594 So.2d 1314 (La.1992), citing Griffin v. California, 380 U.S. 609, 612-13, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965).
When the prosecutor makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared. In the case of such a direct reference, a reviewing court will not attempt to determine the effect that the remark had on the jury. Moser, 588 So.2d at 1247.
Where the reference to the defendant's failure to testify is not direct, the reviewing court will inquire into the remark's intended effect upon the jury in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible). Moser, 588 So.2d at 1247.
According to the Louisiana Supreme Court, when the jurisprudence speaks of the need to ascertain the "intention" of a prosecutor's reference to the unrebutted nature of the state's case, the jurisprudence does not envision the impossible task of reading what was actually in the prosecutor's mind at the time the reference was made. Instead, the test to be employed for determining the "intent" of such a reference is as follows.
In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, the Louisiana Supreme Court has concluded that the prosecutor's argument does not constitute an indirect reference to *132 the defendant's failure to testify. On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, a reference to the testimony as uncontroverted or unrebutted focuses the jury's attention on the defendant's failure to testify and mandates a mistrial. Moser, 588 So.2d at 1247, referencing State v. Johnson, 541 So.2d 818, 822 (La.1989).
The State made the following comments during closing argument:
Who do (sic) have in this case that was an actual eye witness to the events that occurred in the house at 145 Bernice Street on October 24th. It is the only one right there. I shouldn't say that. There is a small child that saw what went on. And I don't think anybody in this jury would reasonably expect that we would have called to the witness stand a child that was two yearsless than two years old three years ago when this happened and three years later ask a two year old or a child that would now be about five what happened three years ago. We all know that is just beyond reason.
So, since we only have one eyewitness, the question becomes is, what is his credibility, is he believable.
. . . .
I ask you another question. Mary and Brent died on October 24th of 1997, I think that is beyond dispute. When did they die? When did they die? Was Brent dead after [the defendant] shot him three times? You heard Dr. Garcia said (sic) that the bullet that hit him here and went into the collar bone area and then kind of lodged over in here, that was a non-lethal wound, he would have survived that. The thing on his face is a bad looking place, but it is basically a cut, a cut caused by a bullet, but it is a cut and the bullet lodged over here in his arm. Then the two shots that were fired while he was protecting himself, went through his body and did damage toone of them perforated his left lung and the other one perforated his spleen and vertebral column and his liver and right lung and both of those wounds were potentially lethal.
But are those the wounds that in fact that killed Brent Louque? How long did he live after he was shot like that. Who would know? Him (indicating).
The same question as to Mary. The first shot, and I am referring to them only by number like Dr. Garcia, because I don't really know which was one first or second, but the shot that went essentially under her arm and left a grazed mark on the arm and all, that then went into the wall, that was a graze, it would not have killed her. And then the shot that was here, it wounded both lungs and her esophagus and Dr. Garcia said that was a potentially lethal wound.
Then Dr. Garcia testified that the two wounds to the back of Mary's head were lethal wounds. Those wounds would haveeither one would have killed her, regardless of whether she had been shot in the chest or not.
So, my question is, was she dead, was she already dead when he shot her in the back of the head? Do we know? Who is the only person that would know? Him (indicating).
Was Brent dead when he shot him in the back of the head? We don't know? Who would know? Him (indicating).
Who would hold (sic) have heard any life sounds that were left in these people after he shot them the first round? Who would have heard any gurgling or moaning or anything like that that would indicate they were still alive when he got them in the head? Him (indicating). And why did he shoot them in the *133 head? The defense would have you believe that this is some sort of a just a continuation of this manslaughter rage, or was it an execution. These potentially lethal wounds, if they would have been treated would they have survived?
We'll never know because he didn't then call 911 and say, there has beenI was attacked and I shot two people, come and get them. He was in perfect safety at that point. Nope, he chose to reload the gun and go over there and shoot both of them in the back of the head.
The defense said that the testimony of [the defendant] consistent with physical evidence and uncontradicted. It is uncontradicted because the people that could contradict it are dead, or they are too young to be able to testify.
The defense moved for a mistrial on the basis of the State's comments "[w]ho would know about what had happened in the course of the crime in terms of what happened to Brent and Mary, and point[ing] at [the defendant.]" The motion was denied, and the defense objected to the court's ruling.
The State's comments indirectly referred to the failure of the defendant to testify in his own defense.
Louisiana Code of Criminal Procedure article 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense; ..." The use of the word "shall" rather than "may" in Article 770 makes it mandatory that a request for a mistrial be granted if the requested mistrial is based properly on a remark or comment proscribed by Article 770. See LSA-C.Cr.P. art. 5. Thus, the denial of a mistrial upon motion of a defendant, when the motion is based properly on one of the grounds listed in Article 770, is "per se a substantial violation of a statutory right." Accordingly, because the proscription in Article 770(3) was violated in this case, the trial court erred by failing to declare a mistrial. See Moser, 588 So.2d at 1248.
However, violation of Article 770(3) is subject to a harmless error analysis. Moser, 588 So.2d at 1248; State v. Lamark, 584 So.2d 686, 699 (La.App. 1 Cir.), writ denied, 586 So.2d 566 (La. 1991).[8] The proper analysis for determining harmless error "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In the instant case, the issue thus becomes, whether the guilty verdicts actually rendered in this trial were surely unattributable to the indirect references by the prosecutor to the defendant's failure to take the stand.
A thorough review of the record convinces us the indirect references by the prosecutor to the defendant's failure to take the stand were harmless error in this trial. The defense did not contest that the defendant, determined his former wife (Mary) was present at her home by telephoning her, then went to her home armed with a five-shot pistol and a pocket full of bullets, and once inside the home shot Mary once in the chest and twice in the back of the head, and shot Louque once in the face, twice in the side, and five times in the back of the head.
*134 The defense claimed the defendant shot Louque and Mary in defense of himself and/or his young child or that the offense was manslaughter.
Louisiana Revised Statute 14:20, in pertinent part, provides:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
. . . .
However, LSA-R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Louisiana Revised Statute 14:22 provides:
It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
Manslaughter is a homicide, which would be either first or second-degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. LSA-R.S. 14:31A(1).
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense, which exhibit a degree of culpability less than that present when the homicide is committed without them. The state does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. State v. Huls, 95-0541, p. 27 (La.App. 1 Cir. 5/29/96), 676 So.2d 160, 177, writ denied, 96-1734 (La.1/6/97), 685 So.2d 126.
There was compelling evidence in this matter that the defendant was the aggressor in the conflict and, thus, was not entitled to claim self-defense. Further, even if it could be found that the defendant was not the aggressor, there was also compelling evidence that the defendant did not act in self-defense of either himself or his child and that the mitigatory factors required to support manslaughter were not established by a preponderance of the evidence. This was not a case where the State merely relied upon "circumstantial or peripheral" evidence to establish the defendant's guilt. Compare Johnson, 541 So.2d at 823. Accordingly, we conclude that the verdict rendered here is surely unattributable to the error.
This assignment of error is without merit.
Even so, we are troubled that the harmless error analysis employed here appears to render the mandatory language of LSA-C.Cr.P. art. 770 meaningless. Mr. Rodriguez was entitled by law to a mistrial and a new trial upon his request when the prosecutor made impermissible comments on his silence. Mr. Rodriguez sought this relief and was denied. It is difficult for us *135 to reconcile this violation of Mr. Rodriguez' right to a new trial with a legal analysis that precludes this right. Mr. Rodriguez apparently has no legal relief for this legal wrong.
We are aware of the Supreme Court's ruling in State v. Johnson, 94-1397, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101, where it ruled that LSA-C.Cr.P. art. 770's mandatory language is not actually mandatory, and we are bound to follow this ruling. We also note that the evidence against Mr. Rodriguez is compelling. But for myriad reasons including engendering respect for the law, allowing reasonable notice to citizens of what to expect in the criminal justice system, interdicting possibly inartful prosecution, among other reasons, we assert that the terms of LSA-C.Cr.P. art. 770 should be enforced. Nonetheless, though we may disagree, we must not disobey.

INSTRUCTIONS TO THE JURY
In assignment of error number 4, the defendant contends various errors and omissions in the instructions to the jury require that a new trial must be granted. In assignment of error 4(A), he contends the jury should have been instructed that if the defendant's account is reasonable and not substantially impeached by the prosecution, it must be accepted as true. In assignment of error 4(B), he contends, "in this unique case," that the instruction on the defense of others was improper since a two-year-old child could not reasonably take any acts in self-defense. In assignment of error 4(C), he contends the jury should have been instructed that provocation could be assessed in terms of the building pressure-cooker of the defendant's life, rather than instantaneously. In assignment of error 4(D), he contends the jury should have been properly instructed concerning the aggressor doctrine insofar as merely going into a house with a gun did not make the accused the aggressor when Brent Louque jumped up at him. In assignment of error 4(E), he contends the jury should not have been instructed to select its white male foreperson by majority vote.
Assignments of error 4(A), 4(C), and 4(D) concern refused special jury charges.
Louisiana Code of Criminal Procedure article 807 provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
Following closing arguments, the defense noted it had requested defense supplemental instruction 38, "to the effect that you must accept the version of defense followed byand offered by the defendant as true unless it is substantially impeached by other evidence." The defense further added, "[w]e had also discussed in chambers the instruction that is also commonly given in this state about how a witness is presumed to tell the truth unless substantially impeached and it is my belief that applies also to statements by the defendant."
The defense also noted it had requested defense supplemental instruction 39,
[W]hich talks about the court instructs the jury that the law allows consideration *136 of facts such as health problems, marital problems, et cetera and other such factors in determining whether provocation was sufficient to deprive the defendant of his self-control and cool reflection. That is a quote from State versus Ruff, R-U-F-F-, 504 So.2d 72 at page 78 [(La.App. 2 Cir.1987)]. To the extent that there is any other problems with that instruction as being not exactly what the court would want to provide, I think that is a proper instruction, but we would alternatively offer to change the instruction to just say, the court instructs the jury that the law allows considerations of any factors that may contribute to the defendant's loss of self-control and cool reflection or words to that effect.
Additionally, the defense stated:
Counsel [for the State] discussed the aggressor doctrine and told the jury that by coming in to (sic) the house armed with a weapon, [the defendant] was somehow the aggressor. That is legally absolutely not the case, and indeed it would violate the Second Amendment to say that someone who is armed with a gun is somehow by definition the aggressor.
We had discussed this in chambers. The court was talking about putting in the aggressor doctrine standard Patton charge, that only emphasizing (sic) the problem that counsel made in closing argument, because it doesn't define what aggressor means and we requested an instruction that the jury be instructed that carrying a gun by definition alone is not evidence sufficient under the law to say you are the aggressor, and that that would be accurately and thoroughly defined.
The court has offered to give the aggressor instruction as was and in my opinion that only emphasizing (sic) the problem and doesn't actually define what we need. So, we would move for a mistrial on that and we had, I will say for the record, said we don't want that instruction given.
State v. Patton, 479 So.2d 625 (La.App. 1 Cir.1985) involved an appeal from an aggravated battery conviction. Patton argued the evidence was insufficient to support the conviction because he acted in self-defense in cutting the victim in the face with a knife and in stabbing the victim with a knife. This Court rejected the defendant's argument, finding:
We find that the trial court correctly concluded that the defendant's use of force in stabbing the victim was not reasonable nor apparently necessary. Moreover, even assuming, as did the trial court, that the defendant disarmed the victim, the defendant became the aggressor and lost the right to claim self-defense when he callously stabbed the victim.
Patton, 479 So.2d at 627.
In the instant case, the trial court did not instruct the jury on the law concerning the aggressor doctrine,[9] did not make reference to any language from Patton, and did not instruct the jury "that carrying a gun by definition alone is not evidence sufficient under the law to say you are the aggressor."
There was no error in the court's refusal to give the special jury charges at issue. In regard to the requested special jury charge concerning accepting the defendant's version of events as true, the charge would have required qualification by the further instruction that the trier of fact may accept or reject, in whole or in *137 part, the testimony of any witness. See State v. Patterson, 540 So.2d 515, 518 (La. App. 1 Cir.1989). Further, to the extent the defendant's version of events was "substantially impeached by other evidence," the instruction was inapplicable.
The requested special jury charge concerning language contained in State v. Ruff, 504 So.2d 72, 78 (La.App. 2 Cir.), writs denied, 508 So.2d 64 (La.1987) and 508 So.2d 65 (La.1987), would have required explanation. Doyle Ruff fatally shot Posey Adamsa man Ruff's estranged wife had been seeing. The court in Ruff found, "[v]iewed in the light most favorable to the prosecution, the evidence preponderates to show that Ruff committed the offense in a sudden passion or heat of blood immediately caused by provocation which would have deprived an average person of his self control and cool reflection." Ruff, 504 So.2d at 78. In reaching this conclusion the court noted:
In essence, this evidence preponderates that immediately before and immediately after the shooting, Ruff was consumed by sudden passion and deprived of cool reflection. The combination of the health problems, the marital problems, the spurning by his wife in favor of someone else, the futile scuffle in the bar and the challenge to settle matters out back were enough to affect the "average person" in this way. The trial judge also found that the shooting itself was attended with Posey's "fairly rapid" advance; according to Ruff, Posey's intent was clear. Thus not only before and after, but at the very instant of the shooting, Ruff was deprived of cool reflection and self-control by provocation that would have affected the average person the same way. (Footnote omitted.)
Ruff, 504 So.2d at 78.
The requested special jury charge concerning Ruff failed to include the conclusion of the court in Ruff which tracked language contained in the definition of manslaughter provided in LSA-R.S. 14:31A(1).
Lastly, the requested special jury charge "that carrying a gun by definition alone is not evidence sufficient under the law to say you are the aggressor[]" was not pertinent on this record. The defendant did much more than merely take a gun into a home. He determined his former wife (Mary) was present at her home by telephoning her, and then went into the home armed with a five-shot pistol and extra bullets. Once inside the home, the defendant shot Mary once in the chest and twice in the back of the head. Additionally, the defendant shot Louque once in the face, twice in the side, and five times in the back of the head. The defendant's pistol was the only weapon discovered at the scene.
Moreover, even assuming arguendo, that the trial court erred in refusing to give the proposed special jury charges, the refusal to give a requested special charge does not warrant the reversal of a conviction unless it prejudices substantial rights of the accused. See LSA-C.Cr.P. art. 921; State v. Domino, 97-0261, p. 7 (La.App. 1 Cir. 2/20/98), 708 So.2d 1143, 1147. The jury instructions given by the trial court in this case protected the substantial rights of the defendant. The court instructed the jury:
The defendant is presumed to be innocent unless or until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt. The defendant is not required to prove that he is innocent. Thus, the defendant begins the trial with a clean slate.
The burden is upon the state to prove the defendant's guilt beyond a reasonable *138 doubt. In considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence.
If you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find him not guilty.
Additionally, the court instructed the jury on the law concerning manslaughter, set forth in LSA-R.S. 14:31A(1), and instructed the jury:
Thus, in order to convict [the defendant] of first degree murder in either count, you must find the defendant killed the person, that the defendant had a specific intent to kill or inflict great bodily harm upon more than one person, that the defendant was not acting in lawful defense of his child or himself, that the defendant did not commit the killing in sudden passion or heat of blood, immediately caused by provocation sufficient to derive (sic) an average person of his self-control and cool reflection, and that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed.
Assignments of error 4(B) and 4(E) concern objections to the court's jury charges.
It is well settled that the ruling of a trial court on an objection to a portion of its charge to the jury will not be disturbed unless the disputed portion, when considered in connection with the remainder of the charge, is shown to be both erroneous and prejudicial. State v. Buchanan, 95-0625, p. 9 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 668, writ denied, 96-1411 (La.12/6/96), 684 So.2d 923.
The defense timely objected to the court's jury charges concerning defense of another and the procedure for selection of a jury foreperson. (R. 3806, 3819.)
In regard to the law concerning defense of another, the trial court instructed the jury:
It is justifiable to kill in the defense of another person, when it is reasonably apparent that the person attacked could have just (sic) justifiably used such means himself and when it is reasonably believed that such intervention is necessary to protect the other person.
Thus, if you find that the defendant committed the offense charged while acted (sic) in defense of another person, and that it reasonably appears to the defendantappeared to the defendant that the other person justifiably could have used such means himself and that the defendant reasonably believed that the intervention was necessary to protect the other person, then you must find the defendant not guilty.
The defendant argued to the trial court, and now argues on appeal, that the trial court should not have included the language in the above charge, "reasonably... appeared to the defendant that the other person justifiably could have used such means himself" because an infant could not be expected to pull out a gun and defend his life.
The disputed portion of the charge to the jury was neither erroneous nor prejudicial. The jury charge at issue does not contain any reference to a child defending himself/herself with a gun, but rather sets forth the law on defense of others provided by LSA-R.S. 14:22.
At the close of jury instructions, the trial court instructed the jury, "[t]he first thing you should do when you retire to the jury room is to choose from your number a person to represent you in returning the *139 verdict. We call this person the foreperson."
The defendant argued to the trial court, and now argues on appeal, that a majority white male jury should not have been permitted to select the foreperson. He relies upon Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998).
Louisiana Code of Criminal Procedure article 792 provides:
When the jury has retired, the jurors shall select a foreman who shall preside over their deliberations and sign the verdict.
The court in Campbell held a white defendant had standing to raise an equal protection challenge to discrimination against black persons in the selection of the grand jury foreperson (brought on behalf of the excluded grand jurors) and had standing to raise his own due process challenge. The court further held that under Louisiana's grand jury selection process provided by LSA-C.Cr.P. art. 413B (prior to amendment by 1999 La. Acts No. 984, § 1), whereby eleven grand jurors were selected by lot, but the foreperson (who was the twelfth grand juror) was selected by the judge, a claim of discrimination in the selection of the grand jury foreperson had to be treated as a claim in the discrimination in the selection of the grand jury itself. As a result, the fact the role of the grand jury foreperson was ministerial did not defeat a discriminatory selection claim. The test was whether a properly constituted grand jury existed.
The instruction on selection of the jury foreperson in the instant case was neither erroneous nor prejudicial. Campbell is inapposite. The jury charge at issue concerned selection of the foreperson of the petit, rather than grand, jury. Unlike the procedure for selection of the foreperson of the grand jury provided by LSA-C.Cr.P. art. 413B (prior to amendment by 1999 La. Acts No. 984, § 1), the procedure for selection of the foreperson of the petit jury provided by LSA-C.Cr.P. art. 792 did not require the judge to select a member of the jury. The trial court herein correctly instructed the petit jury on the procedure for selection of its foreman provided by LSA-C.Cr.P. art. 792.
This assignment of error is without merit.

CHALLENGE FOR CAUSE
In assignment of error number 5, the defendant contends the trial court erred in not striking prospective juror Kirschner for cause. He argues Kirschner was strongly in favor of the death penalty and indicated he felt that certain mitigating circumstances were "not relevant."
Prejudice is presumed when a cause challenge is erroneously denied and the accused has exhausted his allotted peremptory challenges. A trial court's erroneous ruling in the context of exhausted peremptory challenges constitutes a substantial violation of a defendant's rights. On the other hand, under State v. Vanderpool, 493 So.2d 574, 575 (La.1986), a defendant who has not exhausted his peremptory challenges must establish that he was prejudiced by a ruling denying a cause challenge, e.g., that he was forced to hoard his remaining peremptory challenges at the cost of accepting a juror he would have peremptorily challenged. State v. Davis, 97-2750, p. 3 (La.App. 1 Cir. 11/6/98), 722 So.2d 1049, 1051, writ denied, State ex rel. Davis v. State, 99-3521 (La.6/16/00), 764 So.2d 960.
The voir dire transcript indicates that following the trial court denial of a defense challenge for cause against Kirschner, the defense used its first peremptory challenge to strike Kirschner. Thereafter, after *140 the State accepted the twelfth juror (Richard W. Cittadino) and after the defense had exercised ten of its twelve peremptory challenges,[10] the defense indicated:
Your Honor, at this point the defense has to make a record on the fact that we want to exhaust our peremptory challenges, but if we do so, then we are coming up against two jurors that we have to strike.
So, we have got some problems with some of the earlier jurors and we are having a problem with losing our earlier peremptory challenge, but we cannot strike another person now, because the two people coming up are even worse.
So, while we have to make that decision, we are preserving the record for purposes of appeal, that we are being forced into a position, not exhausting our peremptory challenges and preserving the issue on Mr. Kirschner and accept Mr. Cittadino as juror number 12.
Initially, we note, since Cittadino was the twelfth and final member of the jury to be selected, the defense claim that it was "coming up against two jurors that we have to strike[ ]" is not supported by the record. In any event, on appeal, the defendant argues only that the challenge for cause against Kirschner was wrongly denied, not that any objectionable juror was seated for want of peremptory challenges or that he was forced to accept a questionable juror in hoarding remaining challenges. See Vanderpool, 493 So.2d at 575. Even if the trial court should have granted the defense challenge for cause against Kirschner, the defendant has failed to establish the requisite prejudice under Vanderpool. See Davis, 97-2750 at p. 4, 722 So.2d at 1051-52.
This assignment of error is without merit.

PATENT ERROR
Following the trial court's denial of the motion for new trial, the court failed to wait twenty-four hours before imposing sentence. See LSA-C.Cr.P. art. 873. However, the issue was neither assigned as error, nor were the sentences challenged, nor does the defendant cite any prejudice resulting from the court's failure to delay sentencing. Thus, any error that occurred is not reversible. See State v. Augustine, 555 So.2d 1331, 1334 (La.1990).

DECREE
We affirm the convictions and sentences imposed on Charles Rodriguez, Jr.
AFFIRMED.
CLAIBORNE, J., concurring.
I concur.
The serial repetition of the prosecutor's remarks leads to two conclusions. First, any ambiguity by reason of the indirectness of the remark was dispelled. The reference was in effect direct. Second, the serial repetition of the remarks demonstrate that they were not the result of inadvertence, a slip of the tongue, or other momentary lapse. They were intentional and deliberate.
Even intentional and direct remarks in violation of the provisions of Code Crim. P. art. 770(3) are subject to the harmless error rule, which normally is a useful and sensible rule. Harmless error means that, in absence of the error, the verdict would have been the same (beyond a reasonable doubt). In the present case, I agree with *141 the majority in this respect, and I therefore concur.
Where the evidence is so strong that the prosecutor can be confident of an eventual conviction, he or she (by virtue of the harmless error rule) is free to ignore any statute or rule intended to provide for a fair trial, so long as it does not involve what is referred to as a structural error.
A prosecutor, however, should be reminded that harmless error is nevertheless error, and a violation of a statute is not compatible with the sworn obligation to enforce and defend the law. While such activities may be satisfying exercises of power, they do nothing towards engendering respect for the law and the judicial system.
NOTES
[1] The Honorable Ian W. Claiborne, Judge (retired), is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The minutes concerning sentencing indicate, for the two counts of first-degree murder at issue, the trial court imposed one sentence of "life with DOC, without benefit of probation, parole or suspension of sentence." The sentencing transcript indicates on count I, the trial court imposed a sentence of "life in prison without benefit of parole, probation, or suspension of sentencing[,]" and on count II, the court imposed a sentence of "life in prison without benefit of probation, parole, or suspension of sentence." When there is a discrepancy between the minutes and the transcript, the transcript must prevail. State v. Lynch, 441 So.2d 732, 734 (La.1983).
[3] Mary also suffered a "graze wound" under her right arm.
[4] The State used a peremptory challenge against one other African-American prospective jurorScarlett W. Ingram. The defendant makes no specific argument on appeal challenging the State's use of a peremptory challenge against Ingram, and a careful review of the record reveals no abuse of discretion in the trial court's accepting the State's reasons for exercising a peremptory challenge against prospective juror Ingram as race-neutral.
[5] The scope of a Batson claim has been extended to other "suspect classifications," such as gender. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 141-42, 114 S.Ct. 1419, 1428, 128 L.Ed.2d 89 (1994).
[6] Francois's name also appears as "Alton Lamar Francewar, Sr." in the record.
[7] In his brief to this court, the defendant concedes that Mark Cook, an African-American, served on the jury.
[8] Moser and Lamark were decided under the harmless error standard of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
[9] See LSA-R.S. 14:21.
[10] The State and defense were each allowed one additional peremptory challenge during selection of the alternate jurors. The defense exercised this challenge.