GAIDRY, J.
pThe defendant, Dennis L. Magee, was indicted by a Washington Parish Grand Jury in October 2001, for three counts of aggravated rape, in violation of La. R.S. 14:42. The crimes took place from January 1, 2000 through August 13, 2001. On Count I, the victim was D.H. On Count II, the victim was G.H. On Count III, the alleged victim was L.W. Present with counsel at his arraignment, the defendant pled not guilty to all charges. Following a jury trial, the defendant was found guilty as charged on Counts I and II, and not guilty on Count III. The defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on Counts I and II, with the sentences to run concurrently. The defendant now appeals, asserting four assignments of error. For the reasons stated, we affirm the convictions and sentences.
FACTS
In 1999, the defendant lived with Jennifer Whittine in Bogalusa. Ms. Whittine had two daughters living with her, D.H., ten years old, and G.H., eight years old, as well as two other daughters and a son. D.H. and G.H. were friends with Carolyn Taylor’s daughter. D.H. and G.H. often visited and slept over at Carolyn Taylor’s home. D.H. also went on vacation with the Taylor family and, at one point, lived with Carolyn Taylor for about one and a half months.
In July 2001, Carolyn Taylor took D.H. home after a visit with the Taylor family. D.H. went into her home and moments later came back outside screaming. According to Carolyn Taylor, D.H. said she was not staying there with a “child molester,” referring to the defendant, who was in the living room. Ms. Taylor and D.H. then returned to. the Taylor home. The following day, Ms. Taylor took G.H. to stay with her, and telephoned |sthe Office of Community Services to tell them what happened. Shortly thereafter, Carolyn Taylor had all five children from the Whit-tine household staying with her.
According to Carolyn Taylor, G.H. told her that defendant had oral and anal sex with her. She also told Carolyn Taylor that defendant took the sisters to his trailer to rape them. G.H. testified that she had informed her mother that the defendant “put his thing in my back,” but that her mother took no action in response to that revelation. According to D.H., the defendant took her to his trailer in Angie. The trailer, where defendant at one time lived, was then abandoned, had some windows blown out, had no electricity, and had a hole in the roof. D.H. testified that the defendant raped her vaginally and anally. D.H. also told her mother that the defendant was doing improper things with her. D.H. believed her mother may have spoken to the defendant about' it, but that he denied it.
' Detective Scott Adams of the Bogalusa Police Department initially received the *195 information concerning D.H. and G.H. He arranged for an interview with the Children’s Advocacy Center in Covington. Amy Striker, a social worker and forensic interviewer, interviewed the children separately while Tammy Stewart, a Bogalusa City Police officer, Detective Adams, Leslie Lyons, a child welfare supervisor with the St. Tammany Parish Office of Community Services, and Cindy Fanz, a foster care worker, monitored the interview from an adjacent viewing room.
At this point, an arrest warrant was obtained for the defendant. The defendant was arrested at the Franklinton Jail where he was already in custody for the criminal charge of aggravated rape of L.W. According to the defendant’s testimony, he was rendered impotent following a heart attack and was incapable of sexual arousal.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant avers the “trial judge erred in failing to remove juror Lenora Magee[1] from the jury after she advised the court that she was the next-door neighbor of Ms. Carolyn Taylor, a pivotal prosecution witness, and had outside knowledge regarding the charged offenses that was not developed at trial.”
Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Wilson, 2001-0625, p. 10 (La.App. 3rd Cir.12/28/01), 806 So.2d 854, 862, writ denied, 2002-0323 (La.9/13/02), 827 So.2d 1121; see also La.C.Cr.P. art. 797. The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. A trial judge is granted great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed without a showing of an abuse of that discretion. State v. Wilson, 2001-0625 at p. 10, 806 So.2d at 862.
Following opening statements and prior to the State calling its first witness, juror Lenora Magee informed the trial judge that Carolyn Taylor, a State witness, was her next-door neighbor. The trial judge had counsel and Mrs. Magee approach the bench, and an extensive sidebar conference and examination on the subject ensued.[2]
The information elicited from Mrs. Ma-gee reveals that while she and Carolyn Taylor were next-door-neighbors, they were not friends. Also, while Mrs. Magee was told by Carolyn Taylor that “some foster kids” were |fi“sexually abused” by their “mother’s boyfriend”, Mrs. Magee did not know the names of the children, the mother, or the boyfriend. It seems clear from this exchange that, aside from the scant information relayed to Mrs. Ma-gee by Carolyn Taylor, Mrs. Magee never spoke with anyone else about the alleged incident of abuse so as to confirm or repudiate its veracity.
In State v. McIntyre, 381 So.2d 408, 409-10 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980), the defendant had been indicted for aggravated rape and convicted. On appeal, the conviction was reversed, and the defendant was retried. At the second trial, the defendant challenged three prospective jurors because of their prior knowledge of the offense and of the defendant’s previous conviction. Mrs. Kimball and Mr. Tyler *196 had read newspaper accounts of the alleged previous crime. Mr. Tyler knew the defendant had been found guilty in the first trial. He discussed it with acquaintances and had the impression the defendant had raped the victim. Mr. Mason stated that a co-worker was on the jury in the first trial and that his co-worker thought the defendant had been proven guilty beyond a reasonable doubt. The jurors gave testimony that tended to rebut any inference of bias. Mrs. Kimball stated she had not formed an opinion as to the defendant’s guilt or innocence. Mr. Mason stated that the statements of his fellow employee would not influence his decision in this case. Mr. Tyler stated he would put aside any prior knowledge or discussions he had about the case in making his decision and indicated he would presume the defendant innocent and would not vote to convict unless the State had proven him guilty beyond a reasonable doubt. The Supreme Court | Bconcluded the trial court did not abuse its discretion in denying the defendant’s challenges for cause against these jurors.[3]
Similarly, in the instant case, Mrs. Ma-gee stated that she thought she could be fair and impartial in this case. She also explained that knowing Carolyn Taylor would not affect her opinion as to the defendant’s guilt or innocence in stating, “But whether I know her or not has nothing to do with whether he is guilty or innocent to me. I don’t feel that she’s, you know, it’s what comes before the court.”
At the end of the exchange among the trial court, counsel, and Mrs. Magee, defense counsel moved to excuse Mrs. Ma-gee. The trial court recessed to research the issue. Relying on several cases dealing with a similar issue, the trial court stated in pertinent part:
The responses by the juror in this case make it clear to the Court that she would not be disqualified under these terms and this — she testified or she advised the Court and the attorneys that the relationship wasn’t of such a nature that she could not be fair and impartial and I believe her. I think she is a very sincere person. There is no — specifically asked if she was a friend, she said no, just a neighbor. And specifically said she could be fair and impartial; therefore, the motion to remove is denied.
Under the circumstances, we cannot say that the trial court abused its discretion by refusing to remove Mrs. Magee. The circumstances do not indicate that Mrs. Ma-gee could not be fair and impartial. The concerns of bias, prejudice, or less than unequivocal responses raised based upon the voir dire exchange are not so strong as to demonstrate an abuse of the trial court’s exercise of its broad discretion in this area. See State v. McIntyre, 381 So.2d at 410; see also State v. Kang, 02-2812, p. 8 (La.10/21/03), 859 So.2d 649, 655.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant avers the trial court erred in failing to excuse Toni Taylor for cause *197 during jury selection. Specifically, the defendant contends that Toni Taylor should have been excused because she would not be able to concentrate, having recently been widowed, and because her responses were inconsistent. When defense counsel challenged Toni Taylor for cause, the trial court denied the challenge. Defense counsel objected to the court’s ruling. Defense counsel used his twelfth peremptory challenge to strike Toni Taylor from the panel. Thus, Toni Taylor never served on the jury.
An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. La. Const, art. I, § 17(A). The purpose of voir dire examination is to determine prospective jurors’ qualifications by testing their competency and impartiality and discovering bases for the intelligent exercise of cause and peremptory challenges. State v. Burton, 464 So.2d 421, 425 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985). A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. State v. Martin, 558 So.2d 654, 658 (La.App. 1st Cir.), writ denied, 564 So.2d 318 (La.1990). But a refusal by the trial court to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, he has | «demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Copeland, 530 So.2d 526, 534 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). A trial court is accorded great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Martin, 558 So.2d at 658.
A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. La.Code Crim. P. art. 800(A). Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. To prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280-1281. It is undisputed that defense counsel exhausted all of his peremptory challenges before the selection of the eleventh juror. Therefore, we need only determine the issue of whether the trial court erred in denying the defendant’s challenge for cause regarding prospective juror Toni Taylor.
Louisiana Code of Criminal Procedure article 797 provides, in pertinent part, that:
The state or the defendant may challenge a juror for cause on the ground that:
[[Image here]]
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
_k- • •
*198 (4) The juror will not accept the law as given to him by the court.[4]
The defendant contends that Toni Taylor’s responses during voir dire revealed that she could not be an unbiased and focused juror. When questioned regarding her ability to concentrate, she admitted being distracted because she had been widowed six days prior to appearing for jury duty. She was also due in court several days later for a custody dispute.[5]
Contrary to the defendant’s assertion, we find Toni Taylor’s responses indicated a willingness to participate as a juror. She agreed that she would give it a “hundred percent” if selected. Moreover, we do not see where distraction falls within the purview of La.C.Cr.P. art. 797, specifically paragraphs (2) and (4). Challenge for cause under these paragraphs of the article requires that a juror cannot be impartial or will not accept the law. Minor or temporary distraction is not cause under Article 797, and since being so distracted cannot be equated with partiality or with refusing to accept the law, we will not read such a ground for a challenge for cause into the article.
The defendant further contends that later in the voir dire, Toni Taylor’s responses were inconsistent on the issue of her attitudes relating to an alleged crime against a niece. In terms of her ability to serve as a juror, we find it irrelevant that Toni Taylor disagreed with a jury verdict that found a defendant not guilty for that alleged crime. The record reveals that Toni Taylor did not serve on that jury or have anything to do with the case. Moreover, Toni Taylor repeatedly stated that she could be a fair and impartial juror. She indicated it would not be difficult for her to vote not Imguilty in this case. She further declared that she would not feel another person would be getting away with rape if she voted not guilty.
When Toni Taylor was asked whether going through counseling with her niece would color her ability to be fair and impartial, she responded, “Yes.” Defense counsel then asked, “So you just feel this ease kind of hits a little too close to home that you really can’t be a fair juror in this case?” She responded, “No, I feel like I could.” The defendant characterizes the foregoing responses as “schizophrenic.”
We do not find Toni Taylor’s responses “schizophrenic” or even inconsistent. A complete reading of her voir dire examination reveals that there was a misunderstanding as to the meaning of the phrase “color your ability.” Given that Toni Taylor insisted that she could be a fair juror and that she knew what to look for, it is clear she interpreted the phrase “color your ability” to mean using the experience of counseling to assist her in being fair and impartial, as opposed to adversely affecting her ability to be fair and impartial, as intended by defense counsel.[6]
A prospective juror’s seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge’s refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Kang, 2002-2812 at p. 5, 859 So.2d at 653.
The line-drawing in many cases is difficult. Accordingly, the trial judge must determine the challenge on the basis of the entire voir dire, and on the judge’s *199 personal observations of the potential jurors during the questioning. Moreover, the reviewing court should accord great deference Into the trial judge’s determination, and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the juror’s qualification or disqualification. State v. Miller, 99-0192, p. 14 (La.9/6/00), 776 So.2d 396, 405-406, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001).
While defense counsel was concerned with Toni Taylor’s ability to concentrate and alleged inconsistent responses, the trial court was in the best position to determine whether Ms. Taylor would discharge her duties as a juror in that regard. Upon reviewing the voir dire in its entirety, we cannot conclude that the trial court erred in denying defense counsel’s challenge for cause. This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant argues the trial judge erred in not reseating black jurors challenged peremptorily by the State when it became apparent that the prosecutor had utilized his peremptory challenges in a racially discriminatory manner.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. See also State v. Mitchell, 99-0283, p. 7 (La.App. 1st Cir.6/22/01), 808 So.2d 664, 669. Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of their race. State v. Tilley, 99-0569, p. 4 (La.7/6/00), 767 So.2d 6, 12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). h, The combination of factors needed to establish a prima facie ease are: (1) the defendant must demonstrate that the prosecutor’s challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the venire member on account of race. State v. Myers, 99-1803, p. 4 (La.4/11/00), 761 So.2d 498, 501.
The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor during voir dire that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empanelled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
No formula exists for determining whether the defense has established a prima facie case of purposeful discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venire-persons has emerged during voir dire but also whether the prosecutor’s questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. State v. Rodriguez, 2001-2182, pp. 6-7 (La. App. 1st Cir.6/21/02), 822 So.2d 121, 128, *200 writ denied, 2002-2049 (La.2/14/03), 836 So.2d 131.
Second, if the requisite showing has been made by the defendant, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. The second step of this process does not 1^demand an explanation that is persuasive, or even plausible. At that step, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral. Mitchell, 99-0283 at p. 7, 808 So.2d at 669-670. This is a burden of production, not one of persuasion. State v. Harris, 2001-0408, p. 4 (La.6/21/02), 820 So.2d 471, 473.
Faced with a race-neutral explanation, the defendant then must prove to the trial court purposeful discrimination. The proper inquiry in this final stage of the Batson analysis is whether the defendant’s proof, when weighed against the prosecutor’s proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Tilley, 99-0569 at p. 5, 767 So.2d at 12. The ultimate burden of persuasion is on the defendant. State v. Young, 551 So.2d 695, 698 (La.App. 1st Cir.1989).
The trial court should examine all of the available evidence in an effort to discern patterns of strikes and other statements or actions by the prosecutor during voir dire that support or reject a finding of discriminatory intent. Because the factual determination pertaining to intentional discrimination rests largely on credibility evaluations, the trial court’s findings are entitled to great deference by the reviewing court. Tilley, 99-0569 at p. 5, 767 So.2d at 12-13.
In the instant case, the prosecutor used peremptory challenges to excuse Climel Young and Carrie Henry, two African-Americans from the first panel of prospective jurors. Defense counsel objected to the challenges. The trial court found no improper pattern in the use of the challenges and overruled the objections. The prosecutor then used peremptory challenges to |14excuse Kylandis Jackson and Karen Cotton (as alternate), two African-Americans, from the second panel of prospective jurors. While the prosecutor used peremptory challenges to excuse four prospective African-American jurors, only Climel Young and Kylandis Jackson are at issue under this assignment of error.[7]
When the prosecutor challenged Kylan-dis Jackson, defense counsel requested a racially neutral reason for the excusal. At this point, the trial judge stated, “I am going to—I would out of an abundance of caution ask the State to give its reasons as *201 to Ms. Jackson and Mr. Young and Ms. Henry.”
The prosecutor responded:
Okay. With regards to Ms. Jackson ... I asked did anybody else have a problem concentrating on the case, Ms. Jackson talked about being in school. She said she had just started Delta College in Covington.... I asked her did she think that would cause her not to be able to concentrate. She said yes, it would cause a problem to (sic) her. I questioned her a good while about having people take notes for her and things of that sort, but she continued to affirm that she would have a hard time concentrating on the case because she would be thinking about that.
[[Image here]]
Mr. Young testified that he knew the defendant. That he thought he went to school with him, but he wasn’t sure. Then he said he didn’t know him although he went to school with him. I really had a question as to whether Mr. Young was being honest with me. You can’t go to Varnado High School and somebody is your age, if you go there you know them because of the small size of the school.
JiS' • •
Carrie Henry ... She was the one who had been on a jury who had acquitted.
After the prosecutor’s explanations, the trial court ruled there was no Batson violation shown, and allowed the use of the peremptory challenge by the State.
The defendant contends that the trial court’s “demand” that the prosecutor give reasons for excusing these jurors is “tantamount to a finding that the defense has presented enough evidence to meet the initial burden in step one, or that a prima facie case of discrimination has been made.” The State, on the other hand, characterizes the trial court’s request as “a tentative statement at best,” and does not indicate that the trial court found such a prima facie showing.
Whether or not the defendant made a prima facie showing is immaterial since the prosecutor offered race-neutral explanations and the trial judge found no Batson violation. Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. Rodriguez, 01-2182 at p. 8, 822 So.2d at 129.
We find that with respect to step two of the Batson analysis, the State’s reasons for exercising peremptory challenges against Climel Young and Kylandis Jackson were facially race-neutral. They contained none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Accordingly, the State sustained its burden of articulating race-neutral reasons for its exercise of the |1fiperemptory challenges at issue. See Rodriguez, 2001-2182 at p. 9, 822 So.2d at 129.
Whether these reasons were substantial and whether they are substantiated by the record is determined in step three of the Batson analysis. See State v. Burns, 98-0602, p. 21 (La.App. 1st Cir.2/19/99), 734 So.2d 693, 705, writ denied, 99-0829 (La.9/24/99), 747 So.2d 1114. After a careful review of the entire record of voir dire, we find no abuse of discretion or error by the trial court in accepting the State’s reasons for exercising a peremptory challenge against prospective jurors Climel Young and Kylandis Jackson as race-neutral. The reasons offered in support of the State’s challenges against Climel Young *202 and Kylandis Jackson were race-neutral and supported by the record. Further, the challenges against those potential jurors were not part of a pattern of racial strikes. The State used five peremptory challenges of its allotted twelve to excuse three African-American jurors and two white jurors, as well as the additional challenge to strike the potential alternate. Had discrimination been its purpose, the State had seven unused peremptory challenges available, which it could conceivably have used to exclude the three African-American jurors who served on the jury. See Rodriguez, 01-2182 at pp. 9-10, 822 So.2d at 129-130; see also State v. White, 96-0592, p. 8 (La.App. 1st Cir.12/20/96), 686 So.2d 96, 101, where we found the State’s use of peremptory challenges against prospective African-American jurors was not a Batson violation where one African-American served on the jury, and the State had six unused peremptory challenges.
We reject the defendant’s claim that the State’s expressed reasons for striking Climel Young and Kylandis Jackson were pretextual because jurors who either sat on the jury or were not challenged by the State shared similar 117circumstances with them. The defendant was from Angie. Climel Young lived in Angie. Sherry Seal and Jacqueline Brignac, white jurors who sat on the jury, also lived in Angie. The defendant contends that because all three jurors lived in Angie, the fact that the prosecutor excused the African-American juror, but not the two white jurors, indicates discrimination by the prosecutor. We disagree with that generalization. The fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor’s explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror. State v. Collier, 553 So.2d 815, 822 (La.1989). Furthermore, the main reason given by the prosecutor for excusing Climel Young was that he felt he was not honest. The record shows that Mr. Young was eleven years younger than the defendant, yet he testified that he and the defendant went to high school together, a highly unlikely circumstance.
Similarly, the defendant contends that the prosecutor’s challenge of Kylandis Jackson was racially motivated. Ms. Jackson stated she was in school and would find it hard to pay attention as a juror. Toni Taylor, a white venire member, struck by the defense, stated she had become a widow only six days ago and would not be able to “keep [her] mind” on the proceedings. While both jurors expressed some inability to concentrate, the record reveals that Toni Taylor’s responses reflected a willingness to participate as a juror, while Ms. Jackson’s responses maintained a reluctance to participate as a juror.
Thus, while it appears the potential jurors may ostensibly have been similarly situated, the accepted juror (before she was struck by the defense) clearly exhibited a trait the prosecutor believed would make her desirable as |1sa juror — a willingness to participate as a juror. Based on the entire content of the voir dire, we find that the trial court did not err in denying defendant’s Batson challenges as to Mr. Young and Ms. Jackson. This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, the defendant avers the trial judge erred in allowing the videotaped interviews of D.H. and G.H. to be introduced. Specifi *203 cally, the defendant contends that the State did not establish the prerequisites for the introduction of such videotapes pursuant to La. R.S. 15:440.4.
Prior to its amendment by Acts 2004, No. 241, § 1, La. R.S. 15:440.4 provided, in pertinent part:
A. A videotape of a child fourteen years of age or under may be offered in evidence either for or against a defendant charged with the rape or physical or sexual abuse of a child. To render such a videotape competent evidence, it must be satisfactorily proved:
[[Image here]]
(5) That the taking of the child’s statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, licensed professional counselor, or an authorized representative of the Department of Social Services.
B. The department shall develop and promulgate regulations on or before September 12, 1984, regarding training requirements and certification for department personnel designated in Paragraph (A)(5) of this Section who supervise the taking of the child’s statement.
Amy Striker, a licensed social worker and forensic interviewer, interviewed D.H. and G.H. at the Children’s Advocacy Center in Covington. Those interviews were videotaped and audiotaped.
The defendant contends that Paragraphs (A)(5) and (B) of La. R.S. 15:440.4 were not satisfied because Ms. Striker was not supervised and she hadid not meet the qualifications regarding the training requirements and certification for department personnel of the Department of Social Services. The defendant contends Ms. Striker was an agent or “authorized representative” of the Department of Social Services because the Children’s Advocacy Center took referrals from the Office of Community Services, an “arm” of the Department of Social Services.
We reject the proposition that the Children’s Advocacy Center’s acceptance of referrals from the Office of Community Services serves to make Ms. Striker an authorized representative of the Department of Social Services. At trial, Ms. Striker explained, “The Office of Community Services does not run nor supervise the Children’s Advocacy Center or it did not at the time that I was there.” Nothing else in the record suggests that Ms. Striker was an authorized representative of the Department of Social Services. Such being the case, she was not required to meet any qualifications promulgated by the Department.
If Ms. Striker was a licensed social worker when she interviewed D.H. and G.H., as she testified, then Paragraph (A)(5) is clearly satisfied. The defendant contends, however, that the State did not affirmatively establish that Ms. Striker was a licensed social worker at the time of the interview. When asked by defense counsel when she became licensed as a social worker, Ms. Striker responded, “It’s been two years.” Ms. Striker interviewed the victims August 6, 2001. The trial took place during the week of October 20, 2003. Nothing in the record indicates the exact date Ms. Striker was licensed as a social worker. Therefore, the implication is that Ms. Striker could have become licensed after she interviewed D.H. and G.H.
LnWe find it unnecessary to determine when Ms. Striker obtained her license for two reasons. First, one category of eligible person among those required to supervise the interview under Paragraph (A)(5) is a “social worker”, not a “licensed social worker.” Other eligible categories are those of “licensed psychologist” and “licensed professional counselor”. Had the *204 legislature intended for the social worker to be licensed, then it should have added the word “licensed” as it did with “psychologist” and “professional counselor”.[8]
Ms. Striker began her training in 1999 with Dr. Sue Austin, a well-known forensic interviewer. In that same year, Ms. Striker trained in forensic interviewing techniques and how to question children. Pri- or to her quitting because of having a baby, Ms. Striker gave seminars and was asked to speak on techniques in forensic interviewing of children. She holds a bachelor’s degree in psychology from Indiana University, a master’s degree from Tulane University, and a forensic social work certificate from Tulane University. She testified she is a member of the National Association of Social Workers and, at the time, was a member of the National Children’s Advocacy Centers. Ms. Striker further testified that she had conducted approximately six hundred forensic interviews. We conclude that Ms. Striker was qualified as a “social worker” within the meaning of La. R.S. 15:440.4(A)(5).
The second reason why the date of Ms. Striker’s licensure is irrelevant here is that even if we were to find that Ms. Striker was not a “social worker” under the statute, its requirements were nevertheless satisfied |21 because law enforcement officers supervised the interviews of D.H. and G.H. A “law enforcement officer” is one of the eligible required persons in Paragraph (A)(5). At the time Ms. Striker interviewed D.H. and G.H. separately in the interview room, two law enforcement officers, Officer Stewart and Detective Adams, observed the interview on a monitor from the viewing room, next door to the interview room. While conducting the interview, Ms. Striker wore an “ear piece” which enabled the officers to prompt her to pose any questions the officers might have wanted answered. Also present in the viewing room at the time of the interviews were Ms. Lyons, the child welfare supervisor, and Ms. Fanz, the foster care worker. We find no error in the trial court’s ruling on the admissibility of the videotaped interviews of D.H. and G.H. This assignment of error is likewise without merit.
DECREE
The convictions and sentences of the defendant, Dennis L. Magee, are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
MCCLENDON, J., concurs.
| ¶ADDENDUM TO OPINION

Excerpts from Transcript of Sidebar Conference with Ms. Magee

THE COURT: Mr. Gatewood. Okay. Go on ahead and tell them.
MRS. MAGEE: I had no idea. Carolyn Taylor lives next door to me.
[[Image here]]
*205 MRS. MAGEE: And I was told what had happened to some of the children that were staying with her, but I had no name and I had no idea that this had anything to do with anything. I mean, she is my next-door-neighbor. We don’t speak all the time, but we are neighbors.
THE COURT: Do you feel like you can be fair and impartial in this case being you are next-door-neighbors?
MRS. MAGEE: I think I can.
[[Image here]]
EXAMINATION BY MR. GATEWOOD (Prosecutor):
The only thing I would ask is this, you understand that whatever you may have heard back then is not evidence?
A. Yes, I do understand.
Q. And not facts, and you don’t even know — since you don’t know names, whether that has anything to do with this?
A. Yeah, you are right.
Q. If you stay on this jury, you have got to base your decision only on what you hear in this court. Can you do that?
A. Yes, I think I can.
EXAMINATION BY MR. ALFORD (Defense Counsel):
Q. This is not your fault, and we appreciate your coming forward. I made statements in my opening statement that I have been led to believe, if you through your sources have an opinion already as to the truthfulness or the falsity of my statements, I think I need to know that now, you see.
A. I know her as a neighbor.
Q. Uh-huh (affirmative response).
A. Okay. Therefore, I probably know her better than you do.
Q. Uh-huh (affirmative response).
12A. But whether I know her or not has nothing to do with whether he is guilty or innocent to me. I don’t feel that she’s, you know, it’s what comes before the court.
Q. Uh-huh (affirmative response).
A. Do you understand that I am saying whether I know her or not is a moot point as to whether—
THE COURT: Is she a friend?
MRS. MAGEE: Neighbor. Not a friend. A neighbor, but I wouldn’t—
EXAMINATION BY THE COURT:
Q. Do you have an opinion right now that couldn’t be swayed or couldn’t be dealt with as to her credibility: I mean, when she comes here, are you automatically going to believe her as being a credible witness?
MR. ALFORD: Or disbelieve her?
THE COURT: Or disbelieve her?
MRS. MAGEE: Well, probably according to what she says whether I am going to believe what she is saying, I mean.
EXAMINATION BY MR. ALFORD:
Q. The problem is you apparently have outside information, outside of the court, you see. Is that a fact? I mean, you don’t know if it is true or not?
A. And I don’t even know if these were the same children. I didn’t know names.
Q. Uh-huh (affirmative response).
A. I just was told something that happened.
Q. Uh-huh (affirmative response).
A. And that was it.
EXAMINATION BY MR. McNARY (Defense Counsel):
Q. Let me ask you this, who told you?
A. Carolyn Taylor.
Q. Carolyn herself?
*206 A. She’s my next-door-neighbor, but I don’t know that [sic ] the children’s names or anything.
EXAMINATION BY MR. GATE-WOOD:
Q. What did she tell you?
|oA. She told me that she was keeping some foster kids, and she told me that they were sexually abused, and she was having problems with them, bed wetting, et cetera, because—
Q. Did she tell you who she thought did it?
A. No, no, she did say the mother’s boyfriend, but I didn’t even know the mother. I didn’t know.
Q. Did she give you any other facts about what happened to them when they were molested?
A. No, not detail. It was a generalization.
MR. GATEWOOD: Okay.
EXAMINATION BY MR. ALFORD:
Q. Is this just on one occasion that she told you about the children that came in her care?
A. Specifically, yes, that is the only time, because I know, you know, next-door-neighbors I see the kids in the yard. I know she keeps foster children. That’s the only time she gave me any specific information about the past of any of the children she keeps. I can’t believe this.
Pertinent Voir Dire Examination of Ms. Jackson by State
Q. That’s fine, you can have that.... Anybody have any other reason that you, maybe like Mrs. Magee told us here, she had some pain problem or you are on medication or anything like that that could cause you not to be able to spend a couple or three days with us this week?
A. Mrs. Jackson responds affirmatively.
Q. Mrs. Jackson?
A. I am in school, too.
[[Image here]]
Q. Okay. Is there any problem with your not attending for — of course, obviously you missed today?
A. Uh-huh (affirmative response).
Q. And possibly Tuesday and Wednesday. Does that create a problem for you at school?
A. I am going to have to have an excuse. I have to have an excuse to get back.
|4Q. Would it affect you academically not being in school these two or three days?
A. Nods head affirmatively.
[[Image here]]
Q. Good. The fact that you are just kind of getting started on this and you are going to be maybe out until Thursday or something like that, would that affect you while you are sitting here on the jury? In other words, would you be thinking about that, missing class, I hope I can get an excuse, I hope somebody is taking notes as good as I take them, would that be bothering you during this time?
A. Yes, it would.
Q. Would it bother you to the point that you maybe couldn’t pay attention as well as you should?
A. Yes.
Q. Now, ... [a]nd do you feel that because of this school you may not be able to give your undivided attention to the case?
A. Nods head affirmatively.
Q. I know that you will try—
A. I’ll try.
*207 Pertinent Voir Dire Examination of Ms. Taylor by State
Q. Okay.
A. And, I mean, after losing my husband and everything, I am pretty sure, you know, I can’t keep my mind on this.
Q. Certainly. Do you understand the importance just as I spoke to Mrs. Magee and Jackson the importance of having a clear mind as much as possible. We have all got other things happening. Do you believe, and rightly so, you may have some difficulty with that this week?
A. Yes, sir. Any other time, you know, it wouldn’t be a problem.
[[Image here]]
Q. Okay. Even though that may be taken care of, do you feel that those things may weigh on your mind if you couldn’t give your complete attention to the trial?
A. I mean, well, I need something to take my mind off of other things, I mean.
IsQ. I understand. I understand.
A. In a way I feel that, you know, I can do it.
Q. Sure.... You need to do your job. Sometimes that requires that you not feel real good about what we did. Okay. But you do have to have that being able to focus on what you are doing. Do you think even with the tragedy that you have been through that you could focus enough to do your job even if it was unpleasant?
A. I would give it my hundred percent.
Additional Pertinent Voir Dire Examination of Ms. Taylor by State
Q. Have any of you... your family member, close family, close friend been a victim of crime?
A. Mrs. Toni Taylor and Mrs. Cotton respond affirmatively.
Q. Not as many as — would that affect your decision in this case, ma’am?
A. MRS. COTTON: No.
Q. You could put that out of your mind? A. Nods head affirmatively.
Q. Okay.
A. MRS. TONI TAYLOR: Shakes head negatively.
Q. Let’s talk about that a little bit.
THE COURT: Let me just advise you. You have — is it something that you would — you feel comfortable in talking about in front of a group or do you want to explain your answer?
MRS. TONI TAYLOR: Well, I have no problem with it, you know. It was my niece, you know and I had to deal with it, you know, and go with her through therapy and stuff like that. And the man did get away with it.
THE COURT: Proceed. Mr. Gatewood.
[[Image here]]
Q. Do you realize, understand and appreciate that that needs to be left outside the courtroom?
A. Yes, sir.
Q. The Judge can instruct you to base your decision on what you hear from this stand. He is going to tell you you cannot base your decision on sympathy, passion, prejudice, public opinion. Now if he instructs you that that is what you must do, you could follow that instruction, can’t you?
A. Yes, sir.
_k • •
THE COURT: Mrs. Taylor ... can you be fair and impartial to both sides — despite that experience, can you be fair and impartial?
*208 MRS. TONI TAYLOR: Yes, sir.
[[Image here]]
Q. Anybody else who has had a family member or close friend who has been convicted of a crime? I am not talking about a speeding ticket. Anybody?
A. Mrs. Toni Taylor responds affirmatively.
Q. Yes, ma’am.
A. MRS. TONI TAYLOR: My husband got a DUI.
A. MRS. COTTON: I had a—
Q. Again, would that have an affect [sic ] on what you would do here?
A. MRS. TONI TAYLOR: No.
Additional Pertinent Voir Dire Examination of Ms. Taylor by Defense
Q. Mrs. Taylor, I guess I just can’t let it lay there that you said your niece was raped and I think the quote was that he got away. Was there a trial?
A. MRS. TONI TAYLOR: Yes.
Q. And the defendant was found not guilty?
A. Nods head affirmatively. Yes, sir. Also an adult in the past, a 10-year-old that is in my family, that also lied about her age. And you know, she slept with a man. I mean, and then her parents wanted to put rape on him, you know. But you know, I feel at a certain age you know what you are doing. If you have been brought up in a family, you know right from wrong.
Q. I take it then that you disagreed with the jury’s verdict?
A. Yes.
Q. Would it not, ma’am be difficult for you then to vote not guilty in this case?
A. No.
Q. You don’t feel like if you voted not guilty that another guy would be getting away with a rape?
jLjA. No.
Q. Do you feel that the fact that you went through counseling with your niece that would color your ability to be fair and impartial in this case?
A. Yes.
Q. You do think so?
A. Nods head affirmatively. I mean, I know what to look for, you know, pretty much. I mean, I have been there.
Q. Sure. So you just feel this case kind of hits a little too close to home that you really can’t be a fair juror in this case?
A. No, I feel like I could.
Q. All right. I guess I misunderstood you. I thought you said that since you had been there, that that would color your ability to be fair and impartial?
A. No. What I am saying is that, you know, I know what to look for as far as being a young woman, you know, being a young woman myself.
Q. Sure.
A. You know, I have been through the case before and have in the past. I am just saying that I know what to look for.
Q. Would you be looking for any medical evidence?
A. It needs to be presented I believe.
Q. What if it is not presented, could that be a reasonable doubt to you?
A. Yes, sir.

. Despite the identity in surname, the defendant and Mrs. Magee are apparently unrelated.

. See Addendum to Opinion.

. See also State v. Wilson, 01-0625 at pp. 8-11, 806 So.2d at 861-62, where juror Geneva Comeaux, after being sworn in, informed the trial court that she knew Robin Matte, a witness for the State. Ms. Matte’s sister lived with her grandmother, but would stay at Ms. Comeaux's house four or five days a week. The Third Circuit found the trial court did not err by refusing to remove Ms. Comeaux. See also State v. Peterson, 446 So.2d 815, 818 (La.App. 2nd Cir.1984), where defendant challenged juror Lewis Bamburg because of his friendship with a State witness, a deputy sheriff. The Second Circuit found the trial court did not abuse its discretion overruling the defendant’s challenge.

. These are the two paragraphs cited by the defendant in his brief.

. See Addendum to Opinion.

. See Addendum to Opinion.

. In his brief, the defendant concedes that a valid race-neutral reason existed for the challenge of Carrie Henry (Ms. Henry had previously been on a jury that rendered a not guilty verdict). Karen Cotton is only mentioned once in the defendant's brief to indicate that the prosecutor used peremptory challenges on four African-Americans. The entirety of the defendant’s argument under this third assignment of error is dedicated exclusively to potential jurors Climel Young and Kylandis Jackson. There is no argument advanced by the defendant that Karen Cotton was peremptorily struck in a racially discriminatory manner. Similarly, the State, in its brief, other than referring to Karen Cotton as one of the jurors struck, does not mention her again. Since neither the defendant nor the State has alleged racial discrimination, or a lack thereof, of Karen Cotton by way of voir dire testimony, or any reference to the record, or any argument whatsoever, we presume the defendant referred to Karen Cotton simply to establish procedurally what transpired.

. Cf. La. Ch.C. art. 1120, requiring a parent to participate in a minimum of two counseling sessions with, among other eligible professionals, a "licensed social worker.” Also, we note that the "social worker” under La. R.S. 15:440.4(A)(5) was previously required to be board-certified. Subsequent legislation removed the "board-certified” requirement. Acts 1999, No. 1309, § 3, effective January 1, 2000.